SAMUEL P. KING, JR. 1396
ROY Y. YEMPUKU 1228
RUSSEL D. MYRICK 270803 (CA) pro hac vice pending
1163 Kaeleku Street
Honolulu, Hawaii 96825
Ph:  (808) 521-6937
Fax  (808)  533-4745
sam@kingandking.com
ryy@yempukulaw.com
russel@rdmlg.com

Attorneys for Plaintiffs, Individually
   and in Their Representative Capacities
   on Behalf of Class Plaintiffs

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF HAWAII

| | |
|---|---|
| MELODY BASH, SEAN STOVER, GINA ALBANESE, SHONTEL WILLIAMS, DANA BRANUM, JADE COLLIER, RANDY BROCK, HANNA BROCK, LAURA BROCK, NATHAN BROCK, AARON K. BROCK, CASSAN-DRA FAIRALL, MARC PREVOT, KELSEY VADNAIS, and LAURA FINKLE, all above-named Plaintiffs named individually and on behalf of the Class of all other persons similarly situated,<br><br>     Plaintiffs,<br><br>     vs.<br><br>RICHARD T. BISSEN JR., in his capacity as "emergency worker" of Maui Emergen-cy Management Agency; HERMAN | Case No. _____<br><br>**CLASS ACTION COMPLAINT;**<br>**DEMAND FOR JURY TRIAL**;<br>**and SUMMONS** |

ANDAYA, in his capacity as "emergency )
worker" of Maui Emergency Management )
Agency; MAUI EMERGENCY MAN- )
AGEMENT AGENCY ("MEMA"); )
MAUI DEPARTMENT OF FIRE AND )
PUBLIC SAFETY; COUNTY OF MAUI; )
HAWAIIAN ELECTRIC INDUSTRIES, )
INC.; HAWAIIAN ELECTRIC COM- )
PANY, INC.; HAWAII ELECTRIC )
LIGHT COMPANY, INC.; MAUI )
ELECTRIC COMPANY, LIMITED; )
HAWAIIAN TELCOM, INC.; )
HAWAIIAN TELCOM COMMUNICA- )
TIONS, INC.; CINCINNATI BELL, )
INC.; SPECTRUM OCEANIC, LLC; )
CHARTER COMMUNICATIONS, INC.; )
and )
ELLIOT KAWAIHO'OLANA )
MILLS, CRYSTAL KAUILANI ROSE, )
JENNIFER NOELANI GOODYEAR )
KA'OPUA, MICHELLE KA'UHANE, )
and ROBERT K.W.H. NOBRIGA, in )
their capacities as TRUSTEES OF THE )
ESTATE OF BERNICE PAUAHI )
BISHOP; )
and )
DOE DEFENDANTS 1-200, )
                                                  )
                    Defendants.                   )
_____ )

## CLASS ACTION COMPLAINT

Plaintiffs MELODY BASH, SEAN STOVER, GINA ALBANESE, SHONTEL

WILLIAMS, DANA BRANUM, JADE COLLIER, RANDY BROCK, HANNA

BROCK, LAURA BROCK, NATHAN BROCK, AARON K. BROCK,

CASSANDRA FAIRALL, MARC PREVOT, KELSEY VADNAIS, and LAURA FINKLE, all above-named Plaintiffs named individually and on behalf of the Class of all other persons similarly situated, hereby state for their causes of action against Defendants RICHARD T. BISSEN JR., in his capacity as "emergency worker of Maui Emergency Management Agency; HERMAN ANDAYA, in his capacity as "emergency worker" of Maui Emergency Management Agency; MAUI EMERGENCY MANAGEMENT AGENCY ("MEMA"); MAUI DEPARTMENT OF FIRE AND PUBLIC SAFETY; COUNTY OF MAUI; HAWAIIAN ELECTRIC INDUSTRIES, INC.; HAWAIIAN ELECTRIC COMPANY, INC.; HAWAII ELECTRIC LIGHT COMPANY, INC.; MAUI ELECTRIC COMPANY, LIMITED; HAWAIIAN TELCOM, INC.; HAWAIIAN TELCOM COMMUNICATIONS, INC.; CINCINNATI BELL, INC.; SPECTRUM OCEANIC, LLC; CHARTER COMMUNICATIONS, INC.; and ELLIOT KAWAIHO'OLANA MILLS, CRYSTAL KAUILANI ROSE, JENNIFER NOELANI GOODYEAR KA'OPUA, MICHELLE KA'UHANE, and ROBERT K.W.H. NOBRIGA, in their capacities as TRUSTEES OF THE ESTATE OF BERNICE PAUAHI BISHOP; and DOE DEFENDANTS 1-200, as follows:

2

## PARTIES

**A.     PLAINTIFFS, individually and as representatives of the Class Plaintiffs**

1.  The named Plaintiffs are individuals and representatives of the class of all other persons similarly situated (the individual Plaintiffs and the class of all other persons similarly situated to the individual Plaintiffs are hereinafter collectively referred to as the "Class Plaintiffs") who were  residents and/or occupants of real property located in Lahaina, Maui, Hawaii, and/or had property interests located therein on August 8, 2023. The fire which occurred on August 8, 2023, and destroyed Lahaina town (hereinafter referred to as "the Lahaina Fire") resulted in Displacement Damages as further described below to individual Plaintiffs and to Class Plaintiffs and/or the taking of individual Plaintiffs' and Class Plaintiffs' property as further described herein without just compensation.

2**.**  Plaintiff MELODY BASH ("BASH") was born and raised in Lahaina.  Her family rented there.  On  the date of the Lahaina Fire, BASH was working as a server at Lahaina Fish Company.  BASH and her two children were at home when fire got to her home.  BASH and her children fled from her house when the roof collapsed. BASH and her children ran to various locations in Lahaina town fleeing the fire. Eventually, a friend gave her and children a ride out of town.

All of BASH's belonging were destroyed in the Lahaina Fire.  The Federal

Emergency Management Agency ("FEMA") and the Red Cross assisted BAH in locating places to live after she was displace by the Lahaina Fire.  BASH and her family were unable to remain on Maui without employment, so they moved to Colorado where they presently reside.  As a result of the Lahaina Fire, BASH has suffered damages and injury to her person including wrongful and forcible displacement, severe mental anguish (including frightening flashbacks), depression, emotional distress, loss of enjoyment of life, loss of livelihood, and loss of past and future income.  Maui was her family's home.  She is distraught and suffering from depression and wants to return to Lahaina but is unable to do so because she has no home and no job in Lahaina.

3.  Plaintiff SEAN STOVER ("STOVER") is presently a citizen of the State of Oregon living in Bend, Oregon.  On the date of the Lahaina Fire, he rented an apartment in Lahaina at the Spinnaker Apartments located at 760 Wainehi Street which burnt down in the Lahaina Fire.  While living in Lahaina,  STOVER was bartending at the Sly Mongoose, located at 1036 Limahana Pl #3h, and at Amigos located at 658 Front St #145A.  Both restaurants burned down in the Lahaina Fire.

STOVER was trapped in the Lahaina Fire and had to flee to a parking structure where he was rescued after several hours by firemen.  STOVER lost everything in the Lahaina Fire.  As a result of the Lahaina Fire, STOVER has suffered damages and

injury to his person including wrongful and forcible displacement, severe mental anguish, depression, emotional distress, loss of enjoyment of life, loss of livelihood, and loss of past and future income. Maui was his home. He is distraught and suffering from depression and wants to return to Lahaina but is unable to do so because he has no home and no job in Lahaina.

4. Plaintiff GINA ALBANESE ("ABLANESE") had been living in Lahaina for over a year before the Lahaina Fire and was living with her daughter, Plaintiff SHONTEL WILLIAMS, on the date of the Lahaina. ALBANESE was working in Wailuku. When the Lahaina Fire occurred, ALBANESE was at home and saw the fire approaching her house. She immediately got in her car and was able to drive north to her son's home in Kahana. ALBANESE has been displaced by the Lahaina Fire and is no longer able to live with her daughter. ALBANESE received livng assistance from FEMA for a period of time. ALBANESE is now living in Makawao.

Since the Lahaina Fire, ALBANESE received weekly counseling for over a year and was diagnosed with PTSD and placed on medication. She lost everything in the fire. As a result of the Lahaina Fire, ALBANESE has suffered damages and injury to her person including wrongful and forcible displacement, severe mental anguish, depression, emotional distress, loss of enjoyment of life, loss of livelihood, and loss of past and future income. She is distraught and suffering from depression

and PTSD.  At present, her future is uncertain as she cannot afford to live on Maui

any longer, but she cannot afford to leave either.  She lives "day to day."

5. Plaintiff SHONTEL WILLIAMS ("WILLIAMS") was living in Lahaina on

the date of the Lahaina Fire with her mother in a rented apartment.  She was working

two jobs.  On the day of the Lahaina Fire, she and her mother were at home and saw

black smoke approaching their home.  They decided to drive out of danger.

WILLIAMS was unable to save her two cats.

As a result of the Lahaina Fire, WILLIAMS lost her main job which she was

unable to obtain again after a year when her company opened a new store.  She is

unable to work two jobs at this time.  WILLIAMS did receive assistance from FEMA

for about a year.  She presently lives with her sister in Wailuku.

As a result of the Lahaina Fire, WILLIAMS has suffered damages and injury

to her person including wrongful and forcible displacement, mental anguish and

emotional distress, loss of enjoyment of life, loss of livelihood, and loss of past and

future income.

6. Plaintiff DANA BRANUM ("BRANUM") was renting an apartment in

Lahaina on the date of the Lahaina Fire.  She had a cleaning business in Lahaina and

worked part-time at the Monkey Pod in Lahaina.  BRANUM was at Foodland when

she saw the fire approaching her home.  She was able to get to her home and save a

few belongings.  She has been provided some living expenses by FEMA.

The Lahaina Fire, destroyed her business, and she has not been able to rebuild her business.  BRANUM now lives in Ulupalakua and has a job at Maui Wine.  She was unable to find a steady job for about a year after the Lahaina Fire.

As a result of the Lahaina Fire, BRANUM has suffered damages and injury to her person including wrongful and forcible displacement, severe mental anguish, depression, emotional distress, loss of enjoyment of life, loss of livelihood, and loss of past and future income.

7.  Plaintiff JADE COLLIER ("COLLIER") was renting a room in Lahaina on the date of the Lahaina Fire.  She was working in Kihei when the fire occurred but heard terrifying stories of many of her friends who were caught in the fire.  She was self-employed cleaning apartments and houses in the Lahaina area and lost her income as a result of the Lahaina Fire and her income has not recovered.  The Red Cross was able to find her a place to live for a year.  She now lives in the Kihei area with rent assistance from the State of Hawaii, but she will have to start paying rent next year.

As a result of the Lahaina Fire, COLLIER has suffered damages and injury to her person including wrongful and forcible displacement, severe mental anguish, depression, emotional distress, loss of enjoyment of life, loss of livelihood, and loss of past and future income.

7

8.  Plaintiff RANDY BROCK ("RANDY") was living in the Lahaina home of his brother, Aaron M. Brock, on the date of the Lahaina Fire.  RANDY's brother was living on Oahu on the date of the Lahaina Fire (see paragraph 9 below relating to the Brock family) and managing his brother's home and the renters in the home. RANDY was working as a condominium maintenance manager.  On the date of the Lahaina Fire, RANDY was trapped in the house and barely escaped the house and Lahaina town.  As he escaped, he saw horrible sites, including dead and burned bodies.  As a result of the Lahaina Fire, RANDY was unable to find employment and had to move away from Maui.

RANDY was displaced by the Lahaina Fire and is currently residing in Flatrock, Michigan, with his sister and brother-in-law, where he is only able to earn minimal income significantly less than he earned while employed in Lahaina.

As a result of the Lahaina Fire, RANDY has suffered damages and injury to his person including wrongful and forcible displacement, severe mental anguish, depression, emotional distress, loss of enjoyment of life, loss of livelihood, and loss of past and future income.

9.  Plaintiffs AARON K. BROCK ("AARON"), HANNAH BROCK ("HANNAH"), LAURA BROCK ("LAURA"), and NATHAN BROCK ("NATHAN") are the adult children of Aaron M. Brock and Soyeon Brock (hereinafter referred to as the "BROCK Children").  The Brock family built their

home in Lahaina in about 2007 and have lived in Lahaina since they built their home. On the date of the Lahaina Fire, AARON and NATHAN were living with their parents on Oahu to obtain a better education than was available in Lahaina. LAURA and HANNAH were in college on the mainland. All of the BROCK Children and the entire Brock family intended to return to their home in Lahaina after college education. The Brock home located on Kaili Place in Lahaina was completely destroyed by the Lahaina Fire. The Brock Children and the entire Brock family has been traumatized by the loss of their home in Lahaina and have suffered Displacement Damages because of the loss of their family home in Lahaina.

10. Plaintiff CASSANDRA FAIRALL ("FAIRALL") was living in Lahaina with STOVER (see paragraph 2 above) and working in Lahaina at the time of the Lahaina Fire. FAIRALL was with STOVER as they escaped the Lahaina Fire. FAIRALL was displaced by the Lahaina Fire and is presently living with STOVER in Bend, Oregon. She is suffering from major depression and seeking counseling and appropriate medication.

As a result of the Lahaina Fire, PREVOT has suffered damages and injury to her person including wrongful and forcible displacement, severe mental anguish, depression, emotional distress, loss of enjoyment of life, loss of livelihood, and loss of past and future income.

11. Plaintiff MARC PREVOT ("PREVOT") was living in Lahaina on the date

of the Lahaina Fire. He was working as the bar manager at the Lahaina Yacht Club. He was caught and home when the fire was burning and decided to leave his house immediately without taking any of his belongings. Three other renters in his house decided to stay a few minutes longer to gather their belongings together, and all three died in the fire. PREVOT jumped in his car and barely stayed ahead of the fire, closing his car windows and running the air conditioning to stay alive in the pitch black smoke.

PREVOT lost all his belongings and his job as a result of the Lahaina Fire. For the last two years, FEMA has been housing him from place to place, and he presently lives in modular housing erected in Lahaiha by FEMA. He is still not employed but looking for employment.

As a result of the Lahaina Fire, PREVOT has suffered damages and injury to his person including wrongful and forcible displacement, severe mental anguish, depression, emotional distress, loss of enjoyment of life, loss of livelihood, and loss of past and future income.

12. Plaintiff KELSEY VADNAIS ("VADNAIS") was living in Lahaina when the Lahaina Fire occurred. She was working at Montage (north of Lahaina). On the day of the Lahaina Fire, she was in Los Angeles and was unable to return to her home or her job. She has been relocating to different homes since the fire and moving from job to job. She is still living on Maui.

As a result of the Lahaina Fire, VADNAIS has suffered damages and injury to her person including wrongful and forcible displacement, severe mental anguish, depression, emotional distress, loss of enjoyment of life, loss of livelihood, and loss of past and future income.

13. Plaintiff LAURA FINKEL ("FINKLE") is a long-time resident of Lahaina. When the Lahaina Fire occurred, she was off island visiting family in Maine because she did not want to be in Lahaina during fire season - she had been traumatized by the 2018 Lahaina fire and was wary about being in Lahaina during fire season.  On the date of the Lahaina Fire, FINKLE was working two jobs which she lost because of the Lahaina Fire.

Since the Lahaina Fire, FINKLE has been living on the mainland, now in Mendicino, California.  She hopes to return to Maui but is financially unstable at this time, working several jobs, and unable to afford to return to Maui.  FINKLE was already suffering from and being treated for PTSD from the 2018 Lahaina fire and was retraumatized by the Lahaina Fire – three of her roommates died in the Lahaina Fire.  She was assisted for a while by FEMA.

As a result of the Lahaina Fire, FINKLE has suffered damages and injury to her person including wrongful and forcible displacement, severe mental anguish, depression, emotional distress, loss of enjoyment of life, loss of livelihood, and loss of past and future income.

**B.    CLASS PLAINTIFFS**

14.    Class Plaintiffs are individuals, representatives, and legal entities who were homeowners, renters, business owners, residents, and occupants of real property located in Lahaina, Maui, Hawaii om August 8, 2023, and/or had a property interest located therein. The Lahaina Fire resulted in Displacement Damages to Class Plaintiffs, and a taking of Class Plaintiffs' property without just compensation.

**C.    DEFENDANTS**

15.    Defendants are individuals, employers, and legal entities. At all times relevant  to this pleading, Defendants had a duty to protect the Lahaina residents against the Lahaina Fire and are each liable for all the Displacement Damages suffered by Plaintiffs and Class Plaintiffs.  Some or all of the Defendants are also liable for Displacement Damages on the grounds that they violated the Plaintiffs' 5th and 14th Amendment Rights guaranteed under the United States Constitution and or the Hawaii State Constitution.

16.  Defendant RICHARD T. BISSEN, JR.  ("BISSEN") is, and at all times relevant to this Class Action Complaint was, a citizen and resident of the County of Maui, and the State of Hawaii, an "emergency worker" of MEMA, pursuant to HRS 127A-8(a).  BISSEN is deemed to be a "county employee" pursuant to HRS 127A-8(c) and is entitled to indemnification by the County of Maui, pursuant to the doctrine of *respondeat superior.*

12

17.    Defendant HERMAN ANDAYA ("ANDAYA") is, and at all times relevant to this Class Action Complaint, was  a citizen and resident of the County of Maui, and the State of Hawaiian "emergency worker" pursuant to HRS 127A-8(a) and employee of MEMA.  ANDAYA is deemed to be a "county employee" pursuant to HRS 127A-8(c) and is entitled to indemnification by the County of Maui, pursuant to the doctrine of respondeat superior.

18.    Defendant MAUI EMERGENCY MANAGEMENT AGENCY ("MEMA") is, and at all times relevant to this Class Action Complaint was,  a Department of the County of Maui, with its Emergency Operations Center ("EOC") located at 200 S. High Street, Wailuku, Maui.  HRS §127A-5(b) provides that MEMA "shall perform emergency management functions within the territorial limits of the county within which it is organized, coordinate all emergency management plans within the county, and cooperate as closely as possible with the agency and emergency management agencies in the other counties in all aspects of emergency management."

19.    Defendant MAUI COUNTY DEPARTMENT OF FIRE AND PUBLIC SAFETY ("MFD") is, and at all times relevant to this Class Action Complaint was, a department of the County of Maui and is responsible for providing and performing fire fighting and first-responder emergency services in order to save lives and property from fires in the County of Maui, including the prevention and management

of the Lahaina Fire.

20.     Defendant COUNTY OF MAUI ("MAUI") is, and at all times relevant to this Class Action Complaint was, a political subdivision duly organized and existing by virtue of Constitution and laws of the State of Hawaii.  Defendant MAUI is the employer of BISSEN and ANDAYA and the principal of MEMA and MFD, and is liable under the doctrine of respondeat superior, for any Displacement Damages caused by each of them while acting individually and/or through employees acting in the course and scope of their employment as County of Maui employees and/or emergency workers.

21.     Defendant HAWAIIAN ELECTRIC INDUSTRIES, INC., ("HEI") is, and at all times relevant to this Class Action Complaint was, the parent company of Defendants Hawaiian Electric Company, Inc., Maui Electric Company, Limited, and Hawaiian Electric Light Company, Inc. (collectively referred to as "HEI DEFENDANTS"), and is, and at all times relevant to this Class Action Complaint was, doing business in the State of Hawaii, including the County of Maui. HEI is a publicly traded, investor-owned utility company that owns, controls, operates, and/or manages one or more energy plants and equipment that are directly or indirectly for public use for the production. conveyance, transmission, delivery, or furnishing of light and power in the County of Maui, pursuant to HRS Chapter 269.  HEI is in the business of providing electricity to the residents of Maui County, including, but not

14

limited to those residing in the communities of Olinda, Kula, and Lahaina, through a network of electrical transmission and distribution lines. It does regular, sustained business throughout Hawaii, including in Maui County. Its principal place of business is in Honolulu at 1001 Bishop Street, Suite 2900, Honolulu, HI 96813.

22.     HAWAIIAN ELECTRIC COMPANY, INC. ("HECO") is, and at all times relevant to this Class Action Complaint was, doing business in the County of Maui, State of Hawaii, as a public utility company pursuant to HRS Chapter 269. As stated above, HECO is a wholly owned subsidiary of HEI. HECO owns, controls, operates, and/or manages one or more energy plants and equipment that are directly or indirectly for public use for the production, conveyance, transmission, delivery, or furnishing of light and power in the County of Maui, State of Hawaii. Its principal place of business is in Honolulu, Hawaii.

23.     Defendant MAUI ELECTRIC COMPANY, LIMITED ("MECO"), is, and at all times relevant to this Class Action Complaint was, doing business in the County of Maui, State of Hawaii, as a public utility company pursuant to HRS Chapter 269. As stated above, MECO is a wholly owned subsidiary of HEI. MECO owns, controls, operates, and/or manages one or more energy plants and equipment that are directly or indirectly for public use for the production, conveyance, transmission, delivery, or furnishing of light and power in Lahaina, the County of

Maui, State of Hawaii.  Its principal place of is in Maui County.

24.     Defendant HAWAIIAN ELECTRIC LIGHT COMPANY, INC. ("HELCO"), is, and at all times relevant to this Class Action Complaint  was, doing business in the County of Maui, State of Hawaii, as a public utility company, pursuant to HRS Chapter 269.  As stated above, HELCO is a wholly owned subsidiary of HEI. HELCO owns, controls, operates, and/or manages one or more energy plants and equipment that are directly or indirectly for public use for the production, conveyance, transmission, delivery, or furnishing of light and power in the County of Maui, State of Hawaii.  Its principal place of business is in Hawaii County.

25.  Defendant HAWAIIAN TELCOM, INC. ("HAWTEL") is, and at all times relevant to this Class Action Complaint was, a Hawaii domestic company doing business in the State of Hawaii and is engaged in the business of providing integrated communications, technology, and entertainment solutions for business and residential customers. Its principal place of business is in Honolulu at 1177 Bishop Street, Suite 15, Honolulu, Hawai'i, 96813.

26.     Defendant HAWAIIAN TELCOM COMMUNICATIONS, INC. ("HAWTELCOM") is, and at all times relevant to this Class Action Complaint was, a Delaware corporation doing business in the State of Hawaii.  Upon information and belief, Plaintiffs allege that HAWTEL is a wholly-owned subsidiary of

16

HAWTELCOM.

27.  Defendant CINCINNATI BELL, INC. ("CINCINNATI BELL") is, and at all times relevant to this Class Action Complaint was, an Ohio corporation with its principal place of business in Cincinatti, Ohio.  In 2018, the Hawaii Public Utilities Commission approved CINCINNATI BELL's purchase of HAWTEL.  At all times relevant this Class Action Complain, CINCINNATI BELL conducted business in Hawaii through HAWTEL.  To conduct its business, CINCINNATI BELL designs, constructs, maintains, and inspects telcom infrastructure, including hardware and equipment affixed to structures and fixtures, including those at or near the area of origin of the Lahaina Fire.

28.  Defendant SPECTRUM  OCEANIC, LLC ("SPECTRUM") is, and at all times relevant to this Class Action Complaint was, a Delaware limited liability company, with its principal place of business in St. Louis, Missouri,  doing business in the State of Hawaii.  Its stated purpose is cable telecommunication.

29.  Defendant CHARTER COMMUNICATIONS, INC. ("CHARTER") is, and at all times relevant to this Class Action Complaint was, a Delaware coroporation with its principal place of business in St. Louis, Missouri.  CHARTER is the parent company of SPECTRUM.  To conduct its business in Hawaii, CHARTER manages and oversees SPECTRUM's activities, including the design, construction,

maintenance, and inspection of communications infrastructure, including hardware and equipment affixed to structures and fixtures, including those at or near the area of origin of the Lahaina Fire.

30.    Defendants HAWTEL, HAWTELCOM, CINCINNATI BELL, SPECTRUM, and CHARTER are hereinafter collectively referred to as "TELCOM DEFENDANTS".

31.    Defendants ELLIOT KAWAIHO'OLANA MILLS, CRYSTAL KAUILANI ROSE, JENNIFER NOELANI GOODYEAR-KA'OPUA, MICHELLE KA'UHANE, and ROBERT K.W.H. NOBRIGA are named in their capacities as Trustees of the Estate of Bernice Pauahi Bishop ("BISHOP ESTATE") which is, and at all times relevant to this Class Action Complaint was, a charitable foundation owning thousands of acres of fallow agricultural lands covered with vast quantities of accumulated dried combustible vegetation adjacent to residents and units in Lahaina, and beneath poles and transmission lines of HEI DEFENDANTS and TELCOM DEFENDANTS. The highly combustible vegetation was ignited by a fallen power line on August 8, 2023, initially causing the Lahaina Fire, which spread rapidly through the highly combustible vegetation on BISHOP ESTATE lands to residents and units in Lahaina and displaced over 12,000 Lahaina residents who each suffered Displacement Damages.

32.  Plaintiffs have reviewed public and other available records in order to ascertain the true names and capacities of all Defendants in this action. The true names and capacities of all responsible parties are unknown to Plaintiffs.  Plaintiffs are unable to ascertain the identity of the Defendants in this action designated as DOE DEFENDANTS 1-200 who are sued herein under fictitious names for the reason that despite diligent efforts, their true names and identities are presently unknown to Plaintiffs except that they are connected in some manner with the named Defendants and/or were the agents, servants, employees, employers, representatives, subsidiaries, co-venturers, associates, vendors, suppliers, manufacturers, subcontractors or contractors and/or owners, lessees, assignees, licensees, designees, and engineers of the named Defendants and/or in some manner presently unknown to Plaintiffs engaged in activities alleged herein and/or were in some manner responsible for the Displacement Damages sustained by Plaintiffs and Class Plaintiffs, and/or conducted some activity in a negligent or dangerous manner and/or negligently failed to conduct some activity, which such conduct and/or absence of conduct was a a substantial factor in causing Displacement Damages sustained by Plaintiffs and Class Plaintiffs as alleged in this Class Action Complaint, and Plaintiffs and Class Plaintiffs pray for leave to insert herein the true names, identities, capacities, activities and/or responsibilities of the DOE DEFENDANTS when the same are ascertained.

19

## JURISDICTION

33.  The jurisdiction of this Court is proper pursuant to 28 U.S.C. Sec. 1332(d)(2) & (d)(5)(B) ("Class Action Fairness Act" or "CAFA") because Class Plaintiffs contains more than 100 members, Plaintiffs and Defendant are minimally diverse (at least one Plaintiff is not a citizen of Hawaii and at least one Defendant is a citizen of Hawaii), and the amount in controversy exceeds $5 million.  Also, none of the mandatory or discretionary CAFA exceptions to jurisdiction apply to this Class Action Complaint – that is, none of the Defendants in this action are States, State officials, or other governmental entities against whom the district court may be foreclosed from ordering relief (none of the Maui Defendants qualifies pursuant to this exception) (28 USC 1332(d)(5)(A)), this is not the first class action filed in relation to the Lahaina Fire (28 USC 1332(d)(4)(A)(ii)), and at least one of the primary Defendants is not a Hawaii citizen (28 USC 1332(d)(3)).  Finally, this Court has already ruled in its Order filed on April 5, 2024, in the *Naki* (Civ. No. 23-435), *Burnes* (Civ. No. 23-452), and *Eder* (Civ. No. 23-459) Class Actions regarding Displacement Damages related to the Lahaina Fire which were removed to this Court that abstention is not appropriate pursuant to *Colorado River Water Conservation Dist. v. United States*, 424 U.S. 800 (1976).

## VENUE

34.  Venue is proper in the District of Hawaii pursuant to 28 USC 1391(b) as the claims set forth in this Class Action Complaint arose in this District on the Island of Maui, State of Hawaii.

## RULE 23 CLASS ACTION ALLEGATIONS

35.  Plaintiffs bring all Class claims alleged herein as a class action claim on behalf of Class Plaintiffs, and seek to have certified, pursuant to Rule 23 of the Federal Rules of Civil Procedure, the Class Plaintiffs composed of:

> All individuals, representatives, and legal entities who were residents, and occupants of real property located in Lahaina, Maui, Hawaii, and/or had a property interest located therein and who were displaced and/or made homeless by the August 8, 2023, Lahaina Fire and who suffered: (1) non-economic displacement damages, including, without limitation, wrongful death, personal injury, pain and suffering, emotional distress, such as depression, anxiety and PTSD, loss of enjoyment of life, and inconvenience, loss of family, community and cultural relationships and values; and (2) economic displacement damages, including, without limitation, property damages (real and personal), income loss, lost economic opportunities and advantages, business interruption, rebuilding and relocation expenses, increased lease and rent expenses and payments for tenants, down payment assistance and mortgage differential and incidental payments to supplement the cost of leasing or purchasing a comparable replacement dwelling for owners, and assistance liens owed to FEMA, medical providers, etc.; and (3) injuries to persons "as a result of any act or omission in the course of the employment or duties" by any

21

person or persons pursuant to HRS Chapter 127A-(9)(a)(5)
(all of the above referred to in this Class Action Complaint
as "Displacement Damages" whether applicable to
Plaintiffs individually or to Class Plaintiffs)

36. The Class claims have been brought and may properly be maintained as

a class action under Rule 23 of the Federal Rules of Civil Procedure because: (1) the

Class consists of thousands of persons and is so numerous that joinder of all Class

members is impracticable; (2) there are questions of law and or fact common to the

Class; (3) the claims of the proposed Class representatives are typical of the claims

of the Class; and (4) the proposed Class representatives and their counsel will fairly

and adequately protect the interests of the Class. In addition, the questions of law or

fact that are common to the Class predominate over any questions affecting only

individual Class members and the Class Action is superior to other available means

for fairly and efficiently adjudicating the controversy.

a. Ascertainability and Numerosity: The potential Class Plaintiffs as defined

herein are so numerous that joinder would be impracticable. The number of persons

wrongfully and forcibly displaced by the Lahaina Fire is estimated to be over twelve

thousand, and it can be further presumed that the Class Plaintiffs are dispersed

throughout Hawaii, the mainland United States, and other parts of the world outside

the United States. Notice can be provided to the Class Plaintiffs via first class mail,

email, and other techniques using a form of notice similar to those customarily used

in class action lawsuits of this nature.

      b.  <u>Commonality and Predominance of Common Questions</u>:  There are questions of law and fact common to Plaintiffs and the Class Plaintiffs that predominate over any questions affecting only individual members of the Class. These common questions of law and fact include, but are not limited to, the following:

      i. Whether the Defendants had actual knowledge of the 2018 Kaua'ula Valley Wildfire that burned 2,100 acres of accumulated vegetation on KSBE lands, destroyed 21 homes and displaced 60 residents, and came close to destroying Lahaina town.

      ii.. Whether the Defendants had knowledge of the Red Flag Warnings and High Wind Watches issued by the National Weather Service for the Lahaina area, on August, 6, 7, & 8, 2023.

      iii. Whether the failure of BISSEN and/or ANDAYA as supervising employees of MEMA to direct HEI DEFENDANTS to preemptively shut off electric power connections to the Lahaina area, before the Lahaina Fire was ignited, constituted wilful misconduct, gross negligence, and/or recklessness;

      iv. Whether the HEI DEFENDANTS' refusal to preemptively shut off electrical power connections to the Lahaina area, before the Lahaina Fire was ignited,

constituted negligence, wildful misconduct, gross negligence, and/or recklessness;

v. Whether the negligence, wilful misconduct, gross negligence and/or recklessness of the Defendants was a substantial factor in causing Plaintiffs and Class Plaintiffs to suffer Displacement Damages;

vi. Whether BISSEN and ANDAYA, are civilly liable to Plaintiffs and Class Plaintiffs for Displacement Damages under HRS Chapter 127A;

vii. Whether MEMA and/or MAUI are liable for Plaintiffs' and Class Plaintiffs' Displacement Damages, caused by BISSEN's and ANDAYA's wilful misconduct, gross negligence and/or recklessness, under HRS 127A-5(a), (b), (c), (e), HRS 127A-8(a), (b), & HRS 127A-9(a)(5), indemnification, and/or respondeat superior;

viii. Whether MFD had knowledge of the Red Flag Warnings and High Wind Watches issued by the National Weather Service for the Lahaina area on August 6, 7, & 8, 2023;

ix. Whether MFD's failure to post a fire watch at the burn site during Red Flag Warnings and the High Wind Watch conditions constituted wilful misconduct, negligence, or recklessness,

x. Whether MFD's negligence, gross negligence, or recklessness was a substantial factor in causing the Plaintiffs and Class Plaintiffs to suffer Displacement

Damages;

xi. Whether MAUI is liable for Plaintiffs' and Class Plaintiffs' Displacement Damages caused by the negligence, wilful misconduct, gross negligence, and/or recklessness of the MFD;

xii. Whether HEI Defendants had knowledge of the Red Flag Warnings and High Wind Watches issued by the National Weather Service for the Lahaina area on August 6, 7, & 8, 2023;

xiii. Whether HEI DEFENDANTS' failure to preemptively deenergize the electric power lines to the Lahaina area, before the Lahaina Fire was ignited, constituted negligence, wilful misconduct, gross negligence, or recklessness;

xiv. Whether HEI DEFENDANTS' negligence, gross negligence, or recklessness was a substantial factor in causing Plaintiffs and Class Plaintiffs to suffer Displacement Damages;

xiv. Whether HEI DEFENDANTS' and/or the TELCOM DEFENDANTS' failure to maintain its poles and lines, and to reasonably manage or clear the combustible vegetation accumulated on the poles and line/cable rights-of-way constituted negligence, wilful misconduct, gross negligence, or recklessness;

xv. Whether HEI DEFENDANTS' and/or the TELCOM DEFENDANTS' negligence, wilful misconduct, gross negligence, or recklessness

was a substantial factor in causing the Plaintiffs and Class Plaintiffs to suffer Displacement Damages;

xvi. Whether BISHOP ESTATE's failure and refusal to clear the combustible vegetation accumulated on its land adjacent to the Lahaina residences and structures constituted wilful misconduct, negligence, gross negligence, or recklessness;

xvii. Whether BISHOP ESTATE's negligence, wilful misconduct, gross negligence, or recklessness was a substantial factor in causing Plaintiffs and Class Plaintiffs to suffer Displacement Damages;

xviii. Whether the TELCOM DEFENDANTS overloading of their poles or failure to reinforce the poles carrying their lines constituted negligence, wilful misconduct, gross negligence, or recklessness causing the poles and/or lines to fall thereby allowing electric lines on the poles to ignite the combustible vegetation beneath their lines and was a substantial factor in causing Plaintiffs and Class Plaintiffs to suffer Displacement Damages;

c. Typicality: Plaintiffs' claims are typical of the claims of the Class Plaintiffs. Defendants' common course of tortious conduct has caused Plaintiffs and Class Plaintiffs to sustain the same or similar injuries and Displacement Damages caused by the same common violations of law, negligence, wilful misconductd, gross

negligence, or recklessness of Defendants.  Plaintiffs' claims are thereby representative of and co-extensive with the claims of the Class Plaintiffs.

d.  <u>Adequacy of Representation</u>:  Plaintiffs are members of the Rule 23 Class defined herein, do not have any conflicts of interest with other Class Plaintiffs, and will prosecute the case vigorously on behalf of the Class Plaintiffs.  Plaintiffs will fairly and adequately represent and protect the interests of the Class Plaintiffs.  Plaintiffs' attorneys are sufficiently competent, experienced, and associated with others to represent the Class Plaintiffs and pursue a class action on behalf of Class Plaintiffs.

e.  <u>Superiority</u>: The expense and burden of individual litigation by each member make it impractical for Class Plaintiffs to seek redress individually for the wrongful conduct alleged herein.  Should separate actions be brought, or be required to be brought, by each individual Class Plaintiff, the resulting multiplicity of lawsuits would cause undue hardship and expense for the Court and the litigants.  The prosecution of separate actions would also create a risk of inconsistent rulings which might be dispositive of the interests of other Class Plaintiffs who are parties to adjudication and/or may substantially impede their ability to adequately protect their interests.

37.  Excluded from the Class are: (1) Defendants and any of their affiliates,

parents or subsidiaries; all employees of Defendants; the judges assigned to this case, their immediate families, and court staff; and (2) insurers and insurance syndicates whose claims for damages regarding the Lahaina Fire arise out of a right of subrogation, whether equitable, contractual or otherwise; and (3) claims by residents of Olinda, Kula, and Kihei for Displacement Damages, related to wildfires on August 8, 2023.

38.  Plaintiffs hereby reserve the right to amend or modify the Class definition after having had an opportunity to conduct additional investigation and discovery.

39.  The proposed Class meets the criteria for certification under the Federal Rules of Civil Procedure, Rules  23(a), 23(b)(1), 23(b)(2) and/or  23(b)(3).

## PRELIMINARY STATEMENT

40.  In 2014, the Western Maui Community Wildfire Protection Plan ("WMCWPP") documented the wildfire history of western Maui, and reported that, "The majority of wildfires on Maui are caused by human error or arson, especially near developments, power line right of ways, and along roadsides.  Once ignited along the interface, wildfires can spread rapidly through residential areas, threatening both property and life." *Id*. at p. 9.  The WMCWPP gave the Lahaina the highest rated fire danger of  "Extremely Dangerous" and warned that Lahaina was among Maui's most fire-prone areas.  This was based on factors such as Lahaina's proximity

to grasslands, steep terrain, and frequent high winds. *Id., see*, Appendices B3, B5, B15, B21, B22, B23, B25, B26, B27.

In 2019, a series of brush fires across Maui burned thousands of acres.  One Maui wildfire burned thousands of acres and prompted evacuations in Maalaea and North Kihei.  Fire data from the 2020 Maui County Hazard Mitigation Plan Update (MCHMPU) has indicated 80 wildfires directly impacted Maui County between 1999 and 2019.  This results in approximately four wildfires every year occurring within the County overall.  The MCHMPU also warned that the western portion of Maui has a "Highly Likely (greater than 90% annual chance)" probability of experiencing wildfires.

41.  The Lahaina Fire and resulting Displacement Damages was not an "Act of God" or an otherwise "unavoidable accident."  The Lahaina Fire was caused by the negligence, wilful misconduct, gross negligence and/or recklessness of the Defendants who knew that on August 8, 2023, there existed an imminent danger or threat of a disastrous wildfire in Lahaina.  The Lahaina Fire destroyed most of Lahaina town, resulted in 102 deaths, loss of over 3,000 structures and the permanent displacement of approximately 12,000 residents, was preventable and could have easily been averted by the timely exercise of due care and professional responsibility. Defendants knew of the imminent risk of the catastrophic Lahaina Fire on August 8,

2023, based on the 2018 Kaua'ula Valley Wildfire which almost destroyed Lahaina, as well as multiple Red Flag Warnings and High Wind Watches issued by the National Weather Service's ("NWS") on August 6, 7, & 8, 2023.

42. Each of the defendants knew that unless the Red Flag Warnings and High Wind Watch conditions were addressed, including energized electric lines, no brush abatement, no fire watch, overloaded power poles, that a wildfire(s) was inevitable. Yet, the defendants did nothing.  No one has accepted responsibility or apologized for causing the deaths of 102 people, destruction of 3,000 residents and units and indeterminate displacement of over 12,000 residents.  Everyone seems to have a "defense."  The present "solution" is for the defendants to make minimum installment payments to the Lahaina residents so the tortfeasors can move forward as soon as possible. But those who died and the lives of the 12,000 displaced suvivors have been totally destroyed and ruined forever.  This Class Action seeks to obtain full and just compensation which each displaced resident deserves.

## THE  KAUA'ULA VALLEY WILDFIRE

43. On August 24, 2018, fierce down-slope winds associated with Hurricane Lane downed electric power lines which ignited a  massive wildfire in the parched hillsides which spread rapidly over 2,100 acres of highly combustible vegetation accumulated on BISHOP ESTATE property above Lahaina ("Kaua'ula Valley

Wildfire").  The Kaua'ula Valley Wildfire destroyed 21 structures, including 13 homes and displaced 60 residents, and was then, the largest wildfire event in the State's history.  Six hundred people were evacuated overall.  Flames reached the track field at Lahainaluna High School.  The Lahaina Civic Center fire burned 800 acres and one home in Kaanapali.  Miraculously, the Kaua'ula Valley Wildfire stalled before it crossed Lahainaluna Road, sparing Lahaina town and its people from disaster.  ANDAYA was the Director of MEMA at that time.

At a post-fire community meeting held at the Lahainaluna High School cafeteria, residents questioned the lack of a shut off system for power lines at risk during high winds.  They asked why they did not receive an emergency alert on their cell phones, why sirens had not blared, and why firefighters lost access to water. They pointed out the apparent lack of an evacuation plan and asked why Maui Electric Company had not cut the energy to its power lines in anticipation of the fire risk.  "We were running around through town with cinders burning our hairs, banging on doors to wake people up at two in the morning," one resident said at the meeting. "Why did our civil defense siren system fail us?"  People were angry.  Uilani Kapu, whose house was destroyed, yelled at then Mayor Alan Arakawa and his staff about the lack of a brush abatement program.

Five days after the fire, then-Mayor Alan Arakawa told residents, "We could

31

have had a lot of deaths … When you look at the magnitude of the fire that occurred

and the amount of acreage that burned and how close it came to so many houses …

we could have lost most of Lahaina."

44.  County officials also considered themselves lucky that the fire did not

jump Lahainaluna Road, or it would have devastated the town of Lahaina.  At a

special Maui County Council meeting held on August 28, 2018, MEMA Director

ANDAYA, said, "It nearly, nearly reached Lahaina Town.  And had it jumped

Lahainaluna Road, it would have been, I mean, it would have been devastating."

45.  Following the 2023, Lahaina Fire, David Jung, a Lahaina resident who had

also survived the 2018 Kaua'ula Valley Wildfire said, "We were given a bunch of lip

service, and instead of preventing another fire, the focus of the meeting was 'Look,

we're gonna give you guys money and reimburse you,' and we were, 'No, no, no, no

, that is not what we want.  You can give us all the money in the world, we just do not

want this to happen again . . .  But everything we told them was completely, 100%

ignored. . . .  It was all just a replay of 2018," Jung said, "only worse." *NBC News,*

*August 24, 2023.*

46. The MEMA After-Action Report/Improvement Plan For Tropical Cyclone

Lane August 18, 2018, dated August 2019 ("AAR") was issued under seal, and was

never disclosed.  However, after the 2023 Lahaina Fire, Civil Beat went to court to

force the county to disclose it.  The AAR failed to address any of the complaints and questions raised by residents, including failure to  preemptively shut off electric power, lack of warning siren, lack of water for fire fighters, lack of an evacuation plan, and lack of a brush abatement program.  Instead of addressing the mistakes raised by the residents which would have prevented a repeat of future wildfires, the AAR contained recommendations, such as, "Improve air flow and air conditioning of the EOC."

The AAR Conclusion stated, in part: "Much of the EOC's preparation was for the effects of a hurricane or tropical storm, and so we were caught off guard when the threat turned into a large brush fire that came close to engulfing all of Lahaina town."

47.  On August 6, 7, & 8, 2023, the NWS issued multiple Red Flag Warnings and High Wind Watches warning of catastrophic rapidly spreading wildfires on August 8, 2023, which were ignored by the Defendants, including BISSEN and ANDAYA.  Because of the wilful misconduct, gross negligence and/or recklessness, on August 8, 2023, of BISSEN and ANDAYA, MEMA was "caught off guard" again, and the EOC was not fully activated until 4:30 p.m., long after the wildfire had already destroyed most of Lahaina.

## THE NATIONAL WEATHER SERVICE ISSUED SEVEN RED FLAG WARNINGS AND SIX HIGH WIND WATCHES

48.  On Friday, August 4, 2023, the National Weather Service ("NWS") posted

on X (formerly known as Twitter) that Hawaii could experience "indirect impacts"

from Hurricane Dora from Monday, August 7, 2023 through Wednesday, August, 9,

2023. including "strong and gusty trade winds" and "dry weather and high-fire

danger."

49.  On August 6, 7, & 8, 2023, the NWS issued seven  Red Flag Warnings and

six High Wind Watches prior to the ignition of the Lahaina Fire as follows:

50.  On Sunday, August 6. 2023, the NWS issued three High Wind Watches at

3:33 a.m., 10:05 a.m. and 3:24 p.m.  The High Wind Watch issued at 3:33 a.m.,

stated:

> HIGH WIND WATCH IN EFFECT FROM MONDAY MORNING
> THROUGH LATE TUESDAY NIGHT.  IMPACTS: Damaging winds
> could blow down trees and power lines.

The High Wind Watches issued at 10:05 a.m., and 3:24 p.m. repeated the same

warnings.  Lahaina Fire Comprehensive Timeline Report, at pp. 279 - 306.

51.  On August 6, 2023, the NWS issued three Red Flag Warnings at 3:33 a.m.,

4:01 a.m. and 3:33 p.m.  A Red Flag Warning is the highest NWS alert for conditions

that might result in extreme fire behavior.  The Red Flag Warning issued at 3:33 a.m.,

stated:

> CRITICAL FIRE WEATHER CONDITIONS POSSIBLE MONDAY
> MORNING  THROUGH  LATE  TUESDAY  NIGHT  ACROSS
> LEEWARD AREAS.  Strong and gusty winds combined with low
> humidities and KBDI values possibly exceeding 600 may lead to critical

fire conditions across leeward areas over the coming days." "FIRE WEATHER WATCH IN EFFECT FROM MONDAY MORNING THROUGH LATE TUESDAY NIGHT FOR LEEWARD AREAS DUE TO STRONG AND GUSTY WINDS WITH LOW HUMIDITY. The National Weather Service in Honolulu has issued a fire Weather Watch which is in effect from Monday morning through late Tuesday Night. IMPACTS: Any fires that develop will likely spread rapidly. PRECAUTIONARY/PREPAREDNESS ACTIONS. "A Fire Weather Watch means that critical fire weather conditions are forecast to occur."

The Red Flag Warnings issued at 4:01 a.m., and 3:33 p.m. repeated the same warnings. *Id*.

52. On August 6, 2023, at 3:34 a.m., the NWS issued a Fire Weather Planning Forecast which  stated:

"Maui Leeward West - Including Lahaina, Ka'anapali." "FIRE WEATHER WATCH IN EFFECT FROM MONDAY MORNING THROUGH LATE TUESDAY NIGHT" *Id*.

53. On August 6, 2023, the Area Forecast Discussion issued at 9:13 p.m. stated:

FIRE WEATHER Critical fire conditions are highly likely beginning Monday. . . .  Conditions could develop as early as Monday, but Tuesday has the greatest potential as the KDBI is expected to reach near or just above the 600 mark. *Id*. [Emphasis added.]

54. On Monday, August 7. 2023, the NWS issued three more Red Flag Warnings  at 3:15 a.m. and 4:42 a.m. and 3:55 p.m.  The Red Flag Warning issued at 3:15 a.m. stated:  "RED FLAG WARNING FOR LEEWARD ARES DUE TO GUSTY WINDS AND LOW HUMIDITY.  Very dry fuels combined with strong and

gusty easterly winds and low humidities below 45% will produce critical weather conditions" and repeated the admonition that, "Any fires that develop will likely spread rapidly." *Id*.

55. On August 6, 2023, MEMA issued wind watch notices beginning Monday, August 7, 2023, through Facebook and Twitter/X for areas of several Hawaiian Islands, specifically mentioning Maui. A Facebook posting specifically mentioned a Fire Weather Watch for the leeward portions of all Hawaiian Islands. MEMA advised that residents should watch for updates to the fire weather predictions.

56. On August 7, 2023, at 21:00 MEMA partially activated the EOC with two (2) individuals to monitor the high winds and Red Flag weather conditions forecasted by NWS and to prepare for a potential emergency. Senior MEMA member Paul Coe assumed the role as EOC Director. Colleen Hauptman was also assigned to staff the EOC and assisted with monitoring conditions. The partial activation extended to August 8, 2023, at 16:30 when it was fully activated.

On August 8, 2023, MEMA Administrator ANDAYA was unavailable because despite the Red Flag Warnings and High Wind Warnings, he had elected to attend the Pacific Partnership Conference on Oahu.

57. The Red Flag Warning issued on August 7, 2023, at 4:42 a.m., DISCUSSION stated:

The strongest winds are expected over mountain terrain and downslope into leeward areas where a High Wind Warning is in effect. . . .  Wind speeds are expected to ramp up this afternoon/evening from east to west across the state with the window for <u>the strongest winds after midnight tonight through the day on Tuesday</u>." [Emphasis added.]

FIRE WEATHER stated:

Critical fire weather conditions are expected for the next few days as strong winds and a very dry air mass affects the state.  The KDBI is expected to break 600 tomorrow, with the afternoon relative humidities dropping below 45 percent.  Combined with strong winds over 20 mph, the potential for extreme fire behavior is possible with any wildfires that develop and a Red Flag Warning is currently in effect."

The Red Flag Warning issued at 3:55 p.m. did not contain any additional warnings.

*Id*.

58.  The Area Forecast Discussion issued on August 7, 2023, at 3:53 p.m.

stated, in part:

FIRE WEATHER. <u>Critical fire weather conditions  are expected for Tuesday and a Red Flag Warning remains in effect</u>.  Fuels are dry as indicated by the KBDI which is expected to break 600 <u>tomorrow</u>.  RH is expected to drop below the 45% threshold red flag conditions <u>tomorrow</u>. [Emphasis added.] Combined with winds that will be stronger than today, the potential exists for extreme fire behavior with any wildfire that ignites." *Id*.

59.  By August 7, 2023, BISSEN and ANDAYA, knew or should have known

that:

<u>Critical fire weather conditions  are expected for Tuesday and a Red Flag Warning remains in effect.  Fuels are dry as indicated by the KBDI which is expected to break 600 tomorrow.   RH is expected to drop</u>

below the 45% threshold red flag conditions tomorrow. Combined with winds that will be stronger than today, the potential exists for extreme fire behavior with any wildfire that ignites." *Id*. [Emphasis added.]

60.   On August 7, 2023, MEMA communicated through social media channels, such as Facebook and Twitter/X, that a Red Flag Warning had been issued for the Leeward portions of all Hawaiian Islands through Wednesday, August 9, 2023.65.

On Tuesday, August 8. 2023, the NWS issued the seventh Red Flag Warning at 3:17 a.m., prior to ignition of the Lahaina Fire at 6:35 a.m.  The Red Flag Warning stated:

> RED FLAG WARNING FOR LEEWARD AREAS DUE TO STRONG WINDS AND LOW HUMIDITY.  Very dry fuels combined with strong and gusty easterly winds and low humidities will produce critical fire weather conditions through tonight.   RED FLAG WARNING REMAINS IN EFFECT UNTIL 6:00 A.M. HST WEDNESDAY FOR STRONG WINDS AND LOW HUMIDITY. IMPACTS: Any fires that develop will likely spread rapidly. PRECAU-TIONARY/PREPARED-NESS ACTIONS. . . .  A Red Flag Warning means that critical fire weather conditions are either occurring or now or will shortly.  A combination of strong winds, low relative humidity, and warm temperatures can contribute to extreme fire behavior.  *Id*.

61.   On  Tuesday, August 8, 2023, the NWS issued its sixth High Wind Warning at 3:18 a.m.  prior to ignition of the Lahaina Fire at 6:35 a.m.

> HIGH WIND WARNING REMAINS IN EFFECT UNTIL 6:00 A.M. HST WEDNESDAY.  IMPACTS: Damaging winds may blow down trees and power lines."  The Fire Weather Planning Forecast issued at 4:00 a.m., stated: "RED FLAG WARNING IN EFFECT UNTIL 6:00 HST WEDNESDAY.  Very dry fuels (KDBI around 600) combined with strong and gusty easterly winds with low humidities below 45%

will produce critical fire weather conditions through tonight." "Maui Leeward West - including Lahaina, Ka'anapali 4:00 a.m. HST Tuesday August 8, 2023. RED FLAG WARNING IN EFFECT UNTIL 6 A.M, HST WEDNESDAY.

62. On August 6, 7, & 8, 2023, the NWS issued multiple Red Flag Warnings and High Wind Watches which forecast that high wind gusts, low humidity, and dry and highly combustible vegetation would create the risk of "critical fire weather" for the Lahaina area. The NWS also predicted that the high winds could topple power poles and that the power lines could ignite dry and highly combustible vegetation, and that "the potential exists for extreme fire behavior with any wildfire that ignites including that a wildfire that would spread rapidly."

63. On August 8, 2023, at 6:35 a.m., strong wind gusts predicted by the Red Flag Warnings knocked down power lines which ignited very dry fuels which had accumulated on Defendants' MECO, SPECTRUM, and TELCOM's right-of-way at Ku'ialua Street and Ho'okahua Place across from the Lahaina Intermediate School. At approximately 3:00 p.m. the MFD deemed the fire extinguished and the entire squad returned to the station leaving the burn site unattended. At approximately 3:30 p.m. high winds rekindled the burn site which spread rapidly to hundreds of acres of dry combustible vegetation accumulated on fallow BISHOP ESTATE agricultural land causing the huge Lahaina Fire conflagration which jumped Lahainaluna Road and the four lane Lahaina By-Pass Road and destroyed Lahaina town, causing at least

102 deaths, and displacing more than 12,000 residents, including Plaintiffs and Class Plaintiffs.

## COUNT I - DEFENDANT BISSEN'S LIABILITY FOR
## CAUSING THE LAHAINA FIRE

64. Plaintiffs and Class Plaintiffs hereby reallege and incorporate by reference each and every paragraph above, as though the same were fully set forth herein.

65. Pursuant to HRS 127A-5(a)(b), BISSEN, who was installed as the head of MEMA on January 2, 2023, "had direct responsibility for emergency management within the county, including the organization, administration, and operation of a county emergency management agency," and had the duty "to perform emergency management functions within the territorial limits of the county." See, also HRS 127A-11(a).

66. At all times, BISSEN knew that on August 24, 2018, 70 mph winds caused by Hurricane Lane had caused the largest wildfire in Hawaii history, which burned 2,000 acres, destroyed 30 vehicles and displaced 60 residents in the Kaua'ula Valley Wildfire which almost devastated Lahaina.

67. Prior to the Lahaina Fire, BISSEN knew that the National Weather Service had posted Red Flag Warnings and High Wind Watches on August 6, 7 and 8, 2023, forecasting the imminent danger or threat of a disastrous wildfire in West Maui, including Lahaina, caused by high winds downing a power line and igniting the

highly combustible vegetation accumulated on BISHOP ESTATE  property which would spread rapidly to adjacent residences and units and devastate Lahaina.

68.  BISSEN knew that he had the power and authority to prevent the Lahaina Fire by directing the HEI DEFENDANTS to preemptively deenergize its power lines during Red Flag Warning conditions.

69.  The Emergency Proclamation issued by BISSEN on August 8, 2023 at aproximately 8:00 p.m., after the wildfire had destroyed most of Lahaina town, is clear and convincing evidence corroborating Plaintiffs' and Class Plaintiffs' claims that BISSEN's failure to "mitigate hazardous situations in advance of the weather effects from Hurricane Dora" by directing MECO to "shut off . . . electric power connections" violated HRS Chapter 127A, and constituted wilful misconduct, gross negligence and/or recklessness.

70.  BISSEN's decision to allow the HEI DEFENDANTS to continue to energize their lines during Red Flag Warnings and High Wind Watches issued on August 6, 7, and 8, 2023, was a blatant violation of his duty "to perform emergency management functions within the territorial limits of the county."   BISSEN's decision to allow the HEI DEFENDANTS to continue to energize their lines during Red Flag Warnings on August 6, 7, and 8, 2023, destroyed Lahaina town, killed 102 people and displaced over 12,000 residents.

71.  BISSEN could have prevented the Lahaina Fire simply by issuing an Emergency Proclamation preemptively directing the HEI DEFENDANTS to shut off electrical power to Lahaina before the fire, but his conscious indifference to the consequences of a devastating repeat of the 2018 Kaua'ula Valley Wildfire was a substantial factor in causing the Lahaina Fire, the deaths of 102 people and the forcible permanent displacement of 12,000 Lahaina residents.

72.  BISSEN did not issue an Emergency Proclamation until 8:00 p.m., after the Lahaina wildfire had already destroyed most of Lahaina and had already forcibly displaced 12,000 residents.  The  untimely Emergency Proclamation stated, in part, that "due to the possibility of imminent disaster due to property damage and/ or bodily injury to residents of Maui County," the Director of the Maui Emergency Management Agency is directed to take appropriate actions to direct MECO to "shut off . . . electric power connections."

73.  BISSEN's untimely Emergency Proclamation stated, in relevant part, as follows:

WHEREAS, Chapter 127 A Hawaii Revised Statutes, provides for the establishment of County Organizations for emergency management and disaster relief with the Mayor having direct responsibility and authority over emergency management within the County; and

*       *       *

WHEREAS, very dry conditions and strong and potentially damaging easterly winds caused by the passage of Hurricane Dora to the south of the State are contributing to the wildfire danger; and

42

WHEREAS, these fires threaten to cause damages, losses, and suffering of such character and magnitude to affect the health, welfare, and living conditions of a substantial number of persons ...

\*     \*     \*

WHEREAS, due to the possibility of imminent disaster due to property damage and/ or bodily injury to residents of Maui County, and the need for government agencies and representatives from the private sector to mobilize and provide immediate services to outer island residents, a Civil Defense state of emergency is authorized pursuant to Chapters 127 A, Hawaii Revised Statues, as amended; and

WHEREAS, the anticipated occurrence of a severe, sudden, and extraordinary event of damaging high winds and very dry conditions threatens to cause damage, loss, and suffering of such character and magnitude to affect the health, welfare, and living conditions of a substantial number of persons, and to affect the economy of Maui County, and is expected to be of such a nature as to warrant rehabilitative assistance from the County and the State; and

WHEREAS, there is need for government agencies and representatives from the private sector to mobilize and provide immediate services to County residents and to mitigate hazardous situations in advance of the weather effects from Hurricane Dora; and

WHEREAS, pursuant to sections 127A-14(b), Hawaii Revised Statutes ("Haw. Rev. Stat.") the Mayor is authorized to declare by proclamation whether an emergency or disaster has occurred, or there is an imminent danger or threat of an emergency or disaster and authorize actions under chapter 127 A, Haw. Rev. Stat., and the expenditure of funds thereunder; and

WHEREAS, pursuant to Haw. Rev. Stat. §127A-12(c)(l 7), the Mayor may take any and all steps necessary or appropriate to carry out the purposes of chapter 127 A, Haw. Rev. Stat., notwithstanding that powers in Haw. Rev. Stat. §127A-13(b) may only be exercised during an emergency period;

\*     \*     \*

NOW, THEREFORE, I, RICHARD T. BISSEN, JR., Mayor of

43

the County of Maui, pursuant to the authority vested in me as the Mayor of the County of Maui as set forth above, in order to promote and protect the public health, safety, and welfare of the residents and visitors of the County of Maui, do hereby proclaim, determine, declare, and find that:

    1. There is imminent danger of a state of emergency in all or any portion of the County of Maui, as of the date and time of this Proclamation; and

*   *   *

    7. Sections 127A-12(a)(5), 127A-13(b)(3), and 127A-13(b)(4), Haw. Rev. Stat., and the Director of the Maui Emergency Management Agency is directed to take appropriate actions to direct or control, as may be necessary for emergency management:

> e. Shut off water mains, gas mains, electric power connections, or suspension of other services;

74. MEMA never directed MECO to "shut off . . . electric power connections" to the Lahaina area before or after the Lahaina Fire.

75. BISSEN's untimely Emergency Proclamation constitutes a signed and written admission that:

a.  BISSEN knew that he had the direct responsibility and authority over emergency management within the County;

b. BISSEN knew that very dry conditions and strong and potentially damaging easterly winds caused by the passage of Hurricane Dora to the south of the State were contributing to the wildfire danger on Maui and in the Lahaina area;

c.  BISSEN knew that the potential fires threatened to cause damages, losses, and suffering of such character and magnitude to affect the health, welfare, and living

44

conditions of a substantial number of persons on Maui and in the Lahaina area;

 d.  BISSEN knew there was need for government agencies to mobilize and provide immediate services to residents of the County of Maui and to mitigate hazardous situations in advance of the weather effects from Hurricane Dora;

 e.  BISSEN knew there was imminent danger of a state of emergency in all or any portion of the County of Maui of the threat of imminent disaster due to property damage and/ or bodily injury to residents of Maui County; and

 f.  BISSEN knew that he had the emergency power to preemptively order electric power connections to be shut off.

 g.  BISSEN's liability for wilful misconduct, gross negligence and/or recklessness and is clear and convincing evidence of his liability for Plaintiffs' and Class Plaintiffs' Displacement Damages which warrants the imposition of punitive damages in amounts to be proven at trial.

 76.  Upon information and belief, pursuant to HRS 127A-15(a), the Emergency Proclamation was  promulgated by posting it on the applicable state or county emergency management agency website on August 9, 2023.

 77.  By the  time  BISSEN had issued the Emergency Proclamation directing MEMA to shut off electric power connections, at least 102 residents had been killed, more than 3,00 homes and units had been destroyed, and more than 12,000 Lahaina

residents had been forcibly displaced.  The wildfire damage to Lahaina was incalculable, not just billions of dollars to replace burned down homes and units, but 102 deaths, permanently ruined lives, and lifelong and insurmountable burdens and hardships forcibly imposed upon the thousands of displaced and dispossessed residents like Plaintiffs and Class Plaintiffs.

78.  On August 24, 2023, Maui Corporation Counsel Victoria J. Takayesu and its private attorney, L. Richard Fried Jr., signed and filed the Maui Lawsuit filed a lawsuit in the Second Circuit Court of the State of Hawaii against MECO, denominated as *County of Maui v. Maui Electric Company, Ltd., et. al.*, Civ. No. 2CCV-23-238,  alleging that MECO was liable for causing Maui to sustain billions of dollars of damages. The Maui Lawsuit alleged that "[h]ad (Hawaiian Electric) heeded the NWS warnings and de-energized their power lines during the predicted high-wind gusts, this destruction could have been avoided."  The county's lawsuit also alleges that the utility failed to sufficiently maintain its equipment and   that MECO's failure to "deenergize its power lines during the High Wind Watch and Red Flag Warnings, before the ignition of the Lahaina Fire constituted gross negligence." See, paragraphs 102-107.  The Maui Lawsuit is a judicial admission  and clear and convincing evidence corroborating Plaintiffs' and Class Plaintiffs' claim that BISSEN's refusal and/or failure to direct MECO to "shut off . . . electric power

connections" before the ignition of the Lahaina Fire violated HRS Chapter 127A, and

constituted wilful misconduct, gross negligence and/or recklessness.

79. The Maui Lawsuit states, in part, as follows:

COUNT 11—GROSS NEGLIGENCE
(Against MECO. HECO. HELCO. HEI. and DOES 1 through 50)

100. Defendants knew of the extreme fire danger that the high wind gusts posed to their overhead electrical infrastructure, particularly during Red Flag conditions. These risks included the fact that winds could topple power poles and power lines, causing them to fall to the ground, ignite vegetation, and cause a wildfire that would spread quickly.

101. Defendants' 2019 Press Release indicates their knowledge of the known risks of wildfires associated with powerful high-wind gusts.

102. Despite Defendants' knowledge of these extreme risks, Defendants chose not to deenergize their power lines during the High Wind Watch and Red Flag Warning conditions for Maui prior to the Maui Fires starting.

103. Defendants chose not to de-energize their power lines even after they knew some power poles and power lines had fallen and came in contact with the vegetation or the ground.

104. Further, Defendants failed to de-energize their power lines, even after the Maui Fires started.

105. Defendants acted with indifference to the probable consequences of their acts and/or omissions.

106. In the face of knowledge of the risk of high. powerful winds and wildfires generally, a High Wind Watch, a Red Flag Warning, and specific warnings that high winds could blow down power poles and that fires would spread rapidly, Defendants did nothing.

107. Defendants' gross negligence was the direct and proximate cause of the damages and injuries that Plaintiff suffered.

108. As a further direct and proximate result of Defendants' negligence, Plaintiff incurred significant and actual damages, as described herein and in an amount to be proven at trial."

47

110. Defendants' conduct was intentional and malicious, and in complete disregard to the rights of Plaintiff subjecting Defendants to awards of punitive damages.

80. The Maui Lawsuit demonstrates that BISSEN knew that HECO's decision "not to de-energize their power lines even after they knew some power poles and power lines had fallen and came in contact with the vegetation or the ground" was "gross negligence." (See paragraph 107 of the Maui Lawsuit.)

81. BISSEN also knew that HECO's "conduct was intentional and malicious, and in complete disregard to the rights of Plaintiff subjecting Defendants to awards of punitive damages." (See paragraph 110 of the Maui Lawsuit.)

82. BISSEN's failure to direct HECO to preemptively "de-energize power lines during Red Flag Warning and/or High Wind Watch conditions also constituted gross negligence" and was "the direct and proximate cause of the damages and injuries" of Plaintiff's and Class Plaintiffs' Displacement Damages and subjected him to "awards of punitive damages." (See paragraph 107 of the Maui Lawsuit.)

83. On August 30, 2023, Takayesu admitted that based upon a previously undisclosed conflict of interest[1] ("HECO Conflict of Interest"), BISSEN refused to

---

[1] "Mayor Rick Bissen was not involved in Maui County's decision to sue Hawaiian Electric **because his daughter, Sayble Bissen, works for the utility on the island**. "With regards to the **conflict**, the mayor, out of an abundance of caution and to avoid the appearance of impropriety because of family ties within HECO, did not believe it appropriate to be involved in the decision to pursue or not pursue litigation against HECO," said Victoria Takayesu, corporation counsel for Maui County, in an 8/30/2023 email to HNN. [Emphasis added.]

"to be involved in the decision to pursue or not pursue litigation against HECO." BISSEN's decision to prioritize HEI's corporate and financial interest above the safety and welfare of Lahaina residents is clear and convincing evidence of his wilful misconduct, gross negligence and/or recklessness and was a substantial factor in causing the deaths of 102 people and the permanent displacement of 12,000 Lahaina residents.

84. BISSEN knew that Article 10, Section 10-3.1of the Maui Code of Ethics required him to file a financial disclosure statement with the Maui County Clerk and the Board of Ethics disclosing the HECO Conflict of Interest.

85. Upon information and belief, BISSEN failed and refused to file a financial disclosure statement with the Maui County Clerk or the Board of Ethics disclosing the HECO Conflict of Interest, in violation of the Maui Code of Ethics Section 10-4.1.a, also violated his duty of care and loyalty owed to the Plaintiffs and Class Plaintiffs.

86. BISSEN'S violation of Sections 10-3 and 4 of the Maui County Code of Ethics was a substantial factor in causing him to (1) violate HRS Chapter 127A, including, without limitation, permitting HECO to energize its power lines on August 8, 2023, during Red Flag Warning conditions, resulting in the Lahaina Firee and the deaths of 102 people and displacement of 12,000 Lahaina residents, (2) refuse to

ratify the Maui lawsuit against HECO to recover billions of dollars in damages caused by HECO's gross negligence on behalf of the County of Maui, and (3) dismiss Maui's Lawsuit against HECO to protect his daughter's job by protecting HECO  against insolvency.

87.    BISSEN's violation of the Maui Code of Ethics constituted wilful misconduct, gross negligence and/or recklessness, and constituted an egregious and outrageous and a breach of his duty of care and loyalty owed to the Lahaina residents, and requiring him compensate Plaintiffs and Class Plaintiffs for Displacement Damages and warranting the imposition of punitive damages in amounts to be determined at trial. .

88.  The HECO Conflict of Interest was a substantial factor in causing BISSEN to allow the HEI Defendants to energize the power lines during Red Flag Warning conditions on August 8, 2023, and to wilfully refuse to issue an  Emergency Proclamation directing HECO to preemptively shut off it's electrical power to the Lahaina area prior to the Lahaina Fire in violation of HRS Chapter 127A.

89.  Under HRS 127A-5(a), on August 6, 7, and 8, BISSEN had a duty to issue an Emergency Proclamation directing HECO to preemptively "shut off ...electric power connections" to the Lahaina area during Red Flag Warning conditions.

90.  The "conflict" due to "family ties within HECO" impaired BISSEN's

50

ability to perform his duty to issue an Emergency Proclamation directing HECO to preemptively shut off electrical power connections to the Lahaina area on August 8, 2023, during Red Flag Warning conditions in violation of HRS Chapter 127A.

91.   The HECO Conflict of Interest did not excuse or justify BISSEN's decision to refuse to issue a preemptive Emergency Proclamation and/or to permit HECO to energize its power lines on August 8, 2023, during Red Flag Warning conditions.

92.   BISSEN used his official position to secure or grant unwarranted consideration, privileges, exemptions, advantages, contracts, or treatment, for HECO, in violation of Section 10-4(g) of the Maui County Code of Ethics.

93.   BISSEN's duty to enforce HRS Chapter 127A by directing HECO to preemptively shut off electric power connections to the Lahaina on August 8, 2023, superceded the HECO Conflict of Interest.

94.   BISSEN's failure to disclose the HECO Conflict of Interest and to recuse himself as the head of MEMA before the Lahaina Fire constituted wilful misconduct, gross negligence and/or recklessness and a substantial factor in causing the Plaintiffs and Class Plaintiffs to suffer Displacement Damages.

95.   BISSEN's violation of the Maui Code of Ethics and the HECO Conflict of Interest constituted wilful misconduct, gross negligence and/or recklessness, and

was an egregious and outrageous breach of his duties of care and loyalty owed to the citizens of Maui, and specifically to the 12,000 displaced Lahaina residents, including Plaintiffs and Class Plaintiffs, to warrant the imposition of punitive damages in amounts to be proven at trial.

96.  On August 8, 2023, BISSEN permitted the HEI Defendants to energize its lines  during Red Flag Warning conditions thereby causing the wildfire which devastated Lahaina, including, killing 102 people, destroying more than 3,000 residences and units, and displacing over 12,0000 residents.

97.  BISSEN's decision to permit the HEI Defendants to energize its power lines during Red Flag Conditions on August 8, 2023, violated HRS Chapter 127A, and constituted wilful misconduct, gross negligence and/or recklessness.

98.  On August 8, 2023, BISSEN refused to direct the HEI Defendants to preemptively deenergize its lines during Red Flag Warning conditions thereby causing the wildfire which devastated Lahaina, including, killing 102 people, destroying more than 3,000 residences and units, and displacing over 12,0000 residents.

99.  BISSEN's refusal to direct the HEI Defendants to deenergize its power lines during Red Flag Conditions on August 8, 2023, violated HRS Chapter 127A, and constituted wilful misconduct, gross negligence and/or recklessness.

100.  As a result of the foregoing, Plaintiffs and the Class Plaintiffs have suffered Displacement Damages in an amount to be determined at trial.

101.  The conduct of the Defendant BISSEN as alleged herein, was negligent, wilful misconduct, gross negligence, reckless, and/or abnormally dangerous conduct with gross neglect, willfully and wantonly, maliciously, and/or with intentional disregard for Plaintiffs' and Class Plaintiffs' rights, so as to warrant the imposition of punitive damages in amounts to be determined at trial.

## COUNT II - DEFENDANT ANDAYA'S
## LIABILITY FOR CAUSING THE LAHAINA FIRE

102.  Plaintiffs and Class Plaintiffs hereby reallege and incorporate by reference each and every paragraph above, as though the same were fully set forth herein.

103.  ANDAYA was appointed as the MEMA director in 2017, over five years before the Lahaina Fire and prior to the 2018 Kaua'ula Valley Wildfire.

Prior to the Lahaina Fire, ANDAYA knew that the NWS had issued multiple Red Flag Warnings and High Wind Watches on August 6, 7, & 8, 2023, however, instead of being present at the EOC during Red Flag Warning conditions, on August 7, 2023, ANDAYA abandoned his post and went to Honolulu to attend a FEMA conference.

On August 8, 2023, Defendant HERMAN ANDAYA, was the Administrator

of MEMA. ANDAYA was the MEMA administrator on August 24, 2018, when high winds generated by Hurricane Lane caused a wildfire which destroyed the Kaua'ula Valley community including 21 structures and displaced 60 people. At a special Maui County Council meeting held on August 28, 2018, ANDAYA, said, "It nearly, nearly reached Lahaina Town. And had it jumped Lahainaluna Road, it would have been, I mean, it would have been devastating." Despite his knowledge that the Red Flag and High Wind Warnings notices issued by the National Weather Service on August 6, 7 and 8, 2023, had warned of extreme fire danger to Lahaina, on August 7, 2023, ANDAYA abandoned his post to attend a FEMA conference in Honolulu.

104.    During the height of the Lahaina Fire, ANDAYA and his MEMA assistant, Gaye Gabuat, exchanged jokes about the severity of the conditions, which clearly demonstrate their lack of concern and wilful disregard for the lives and safety of the Lahaina residents, as follows:

> 3:53 p.m.
> Gaye Gabuat to Herman Andaya: "**Lol**. Poor chief looks so overwhelm (sic). Chief is wanting help from the military. Not sure of what."
> 4:01 p.m.
> Andaya to Gabuat: "**This is crazy**. How is everyone holding up?"
> 4:03 p.m.
> Andaya to Gabuat: "Should I come home?
> Gabuat to Andaya: "PIOs are funny. There are 3 of them and they look scared and overwhelmed. . . **I think they need a hug lol to calm down**."

105.    After he was notified of the devastation caused by the Lahaina Fire,

ANDAYA was "laughing out loud", and making more jokes, as follows:

> 9:37 p.m.
> Andaya to Gabuat: "How's the other fires?"
> 9:38 p.m.
> Gabuat to Andaya: "Still burning."
> Andaya to Gabuat: "**Wow. . . lol**."
> Gabuat to Andaya: "Now we have Kihei fire near Pulehu Road."
> Andaya to Gabuat: "**You just keep making my day**."
> 10:58 p.m.
> Hawaii Emergency Management Agency administrator James Barros to Andaya: "LtG just called. . .  Very concerned."
> Andaya to Barros: "Yes. . . . this is really bad.  **I'm flying back tomorrow**."

106.  ANDAYA did not return to Maui until August 9, 2023, which was when he first learned that the Lahaina Fire had substantially destroyed Lahaina town, killing 102 people and forcibly displacing 12,000 residents, including Plaintiffs and Class Plaintiffs.

107.  ANDAYA's wilful abandonment of his post and his emails with MEMA during the Lahaina Fire such as, "Wow. . . lol" and "You just keep making my day," and "I'm flying back tomorrow," are clear and convincing evidence that he did not know, and did not care what was occurring and what options were being explored to protect the public in violation of his MEMA Administrator duties.  Instead of staying at his post during Red Flag Warning conditions, On August 8, 2023, ANDAYA and his MEMA staff were just "laughing out loud" while Lahaina burned, causing the deaths of 102 people and displacing 12,000 residents.

108.  On August 18, 2023, ANDAYA resigned, for "health reasons."  In his resignation speech, although he knew that the Lahaina Fire which caused the deaths of 102 people and the permanent displacement of more than 12,000 Lahaina residents, and that many residents had been killed, injured and/or traumatized by his failure to sound the warning siren, he did not apologize or accept responsibility for abandoning his post during Red Flag Warnings or for joking about the Lahaina Fire. Instead, he unabashedly and arrogantly added insult to injury, by stating that he "had no regrets" that he did not sound the warning sirens because, "[h]ad we sounded the siren that night, we were afraid that people would have gone mauka, and if that were the case, they would have gone into the fire."

109.  The Lahaina Fire was not a surprise or an unforeseen event. It was a repeat of the 2018 Kaua'ula Valley Wildfire, and the precise events which caused the Lahaina Fire had been predicted by multiple Red Flag Warnings and High Wind Watches issued by the NWS on August, 6, 7, & 8, 2023, which had been timely received by ANDAYA.

110.  ANDAYA knew exactly what the problems were which caused the 2018 Kaua'ula Valley Wildfire and destruction of the homes and displacement of the Kaua'ula villagers, including lack of preemptive shut off of power lines at risk during high winds, lack of an emergency alert on their cell phones, lack of warning sirens,

lack of water for firefighters, lack of an evacuation plan, and lack of a brush abatement program. ANDAYA completely ignored the dangers posed by wildfires and had completely failed to make any emergency preparations. He did nothing before the Lahaina Fire to address the same factors which had caused and contributed to the 2018 Kaua'ula wildfire, including the failure to preemptively de-energize the power lines in anticipation of the fire risk, the failure to conduct a brush abatement program, the failure to sound the sirens, the failure to provide sufficient water for firefighters, and the failure to provide for an evacuation plan.

111. ANDAYA's failure to perform his responsibilities as MEMA Administrator to protect Lahaina and its residents from a repeat of the 2018 Kaua'ula Valley Wildfire, was a substantial factor in causing the August 8, 2023, Lahaina Fire which killed 102 people and displaced over 12,000 Lahaina residents. Although the 2018 Kaua'ula Valley Wildfire had clearly demonstrated Lahaina's vulnerability to devastation, ANDAYA "100% ignored" his obligation to protect Lahaina and its residents from "lots of deaths" according to a Lahaina resident.

112. As the Administrator of MEMA, ANDAYA had a duty pursuant to 127A-5(b)(e) and 127A-11(a)(3), "to perform emergency management functions" under HRS Chapter 127A, including without limitation, protecting the public health, safety, and welfare, and to preserving the lives, property, and environment of the Lahaina

Maui, by exercising his emergency management powers and functions, including, without limitation, managing first responders, coordinating additional state and federal resources, preparing evacuation routes, and sounding the emergency siren warning the Lahaina residents of the wildfire.

113.  ANDAYA's conscious indifference to the consequences of a devastating repeat of the 2018 Kaua'ula Valley Wildfire and to the multiple prescient Red Flag Warnings and High Wind Watches issued on August 6, 7, and 8, 2023, which resulted in the 2023 Lahaina Fire and constituted wilful misconduct, gross negligence and/or recklessness under HRS 127A-9(a)(5).

114.  ANDAYA failure to take precautionary measures to prevent and protect Lahaina and its residents from a repeat of the 2018 Kaua'ula Valley Wildfire and to direct HECO to proactively deenergize its power lines during the High Wind Watch and Red Flag Warning conditions on August 6, 7, & 8, 2023, was a substantial factor in causing the Lahaina Fire which resulted in the Displacement Damages sustained by Lahaina's 12,000 residents.

115.  As a result of the foregoing, Plaintiffs and the Class Plaintiffs have suffered Displacement Damages in an amount to be determined at trial.

116. ANDAYA's egregious and wilful misconduct, his entire want of care, and conscious indifference to consequences violated HRS §127A-1(a)(2) and HRS

§127A-5(b), and constituted wilful misconduct, gross negligence, and/or recklessness pursuant to HRS 127A 9(a)(5) and warrants an award of punitive damages in amounts to be determined at trial.

## COUNT III - THE HEI DEFENDANTS'
## LIABILITY FOR CAUSING THE LAHAINA FIRE

117. Plaintiffs and Class Plaintiffs hereby incorporate by reference and realleges each and every paragraph above as though fully set forth herein.

118. The 2018-2019 report from the Hawaii Wildfire Management Organization pointed out the unique risk posed by electrical lines: "Above ground power lines are vulnerable to wildfire and can even provide the ignition (sparks) that could start a wildfire, particularly in windy or stormy conditions. There are long-term solutions for reducing power line-related wildfire hazards such as infrastructure upgrades." The report recommended updating the infrastructure and burying power lines, particularly in high-risk areas, and specifically in Lahaina. The HWMO's update hazard mitigation plan lists West Maui as having a "high wind fire risk" and shows all of Lahaina units as being in a wind fire risk area, and the document warns that "populations with limited access to information may not receive time-critical warning information to enable them to reach places of safety."

119. On August 24, 2018, high winds from Hurricane Lane had knocked down a power pole and line which ignited a wildfire which burned over 2,100 acres

of  BISHOP ESTATE land and destroyed the Kaua'ula Valley village, including

residences and displacing 60 people.  Based on the 2018 Kaua'ula Valley Wildfire,

HEI DEFENDANTS also knew that extended drought, high winds, high

temperatures, and low humidity existed in Lahaina, and that it was reasonably

foreseeable and/or highly probable that its high voltage overhead transmission lines

could  fall and ignite dry and highly combustible vegetation accumulated in its right-

of-ways which would spread rapidly to hundreds of acres of adjacent fallow

agricultural land owned by BISHOP ESTATE and to adjacent residences and

buildings and cause a catastrophic wildfire which could devastate Lahaina town

resulting in the displacement of thousands of residents, including Displacement

Damages.

120.  HEI DEFENDANTS, as public utilities, must "exercise reasonable care

to reduce the hazards to which [their] employees, [their] customers, and the general

public may be subjected." Haw. P.U.C. Gen. Order No. 7, § 8.2.a.  The HEI

DEFENDANTS have a duty to properly construct, inspect, repair, maintain, manage,

and operate their power line infrastructure. Haw. Admin. R. ("HAR") § 6-73-11; Nat'l

Elec. Safety Code ("NESC") § 214(A) and have a duty to ensure the power poles can

withstand wind speeds of up to 105 miles per hour. HAR § 6-73-11; NESC §

250-2(b) (2002). The HEI DEFENDANTS also have a duty to keep vegetation

properly cleared at a safe distance to prevent contact with power line infrastructure.

HAR § 6-73-11; NESC § 217(A).

121.  On August 6, 7, & 8, 2023, HEI DEFENDANTS knew that the NWS had issued multiple Red Flag Warnings and High Wind Watches for the Lahaina area, which warned of an imminent danger or threat of an emergency or disaster caused by high winds knocking down energized power lines and igniting the dry and highly combustible vegetation accumulated in its right-of-ways which would spread rapidly cause a catastrophic wildfire.  HEI DEFENDANTS also knew that on August 7, 2023, prior to the Lahaina Fire, that high winds had toppled MECO power lines and caused wildfires in Kula and Olinda.

Upon information and belief, the HEI DEFENDANTS negligently failed to establish or implement any specific protocols to be used when the National Weather Service issues a Red Flag Warning, including, disregarding the PUC Tariff, continual monitoring of weather reports and conditions, surveilling lines as necessary for situational awareness, in the potential Red Flag Warning area, implementing sensitive protection settings to circuits so once a breaker opens, it remains open, localized shut offs in extreme conditions.

122.  At approximately 6:35 a.m. on August 8, 2023, high gusty winds caused a power pole owned by HEI DEFENDANTS to break and fall at Lahainaluna Road

and Ho'okahua Street.  An energized power line owned by HEI DEFENDANTS fell and ignited the dry highly combustible vegetation accumulated in the right-of-way, and which spread rapidly to hundreds of acres of dry vegetation on land owned by Defendant BISHOP ESTATE which created a catastrophic wildfire and caused the destruction of most of Lahaina town, including the deaths of 102 people and displacement of more than 12,000 residents, including Plaintiffs and Class Plaintiffs.

123.  At all times prior to the Lahaina Fire, the HEI DEFENDANTS owned, built, operated, and maintained the power lines, power poles, and other electrical equipment and infrastructure to transmit power to residents, businesses, schools, and other entities in the area adjacent to Lahainaluna Road.

124.  At all times prior to the Lahaina Fire, HEI DEFENDANTS owned or controlled rights-of-way and designed, constructed, and owned infrastructure, including poles and electric power lines, which it used to transmit electricity to the residents and businesses located in the Lahaina area.

125.  HEI DEFENDANTS had a duty to properly design, maintain, and repair the electric poles and high voltage transmission lines, and other equipment associated with their transmission of electricity, including the installation of a PSPS system, to prevent fallen power lines from igniting wildfires and to protect the residents of Lahaina.

126.  Based on the 2018 Kaua'ula wildfire, HEI DEFENDANTS also knew or should have known that their electric poles and high voltage transmission lines were defective and/or otherwise unfit or inadequate to safely transmit electricity in the Lahaina area during Red Flag Warning and High Wind Watch conditions.  The HEI DEFENDANTS had also allowed the TELCOM Defendants to overload the power poles and/or failed to reinforce them to prevent high winds from snapping or downing them.

127.  HEI DEFENDANTS' failure to design, maintain and continuously upkeep their utility infrastructure, including power lines and poles and installation of a PSPS system, was negligent and grossly negligent and/or a violation of HRS §132-8, and a substantial factor in causing the Lahaina Fire which caused thousands of residents, including Plaintiffs and Class Plaintiffs to suffer Displacement Damages.

128.  Based on the 2018 Kaua'ula wildfire, HEI DEFENDANTS knew that the dry and highly combustible vegetation accumulated on its rights-of-way could be ignited by a downed energized power line which would spread rapidly to the adjacent land and cause a catastrophic wildfire which would destroy thousands of homes and business in Lahaina resulting in thousands of residents to be displaced and/or rendered homeless.

129.  On August 8, 2023, high gusty winds caused an energized power line

owned by HEI DEFENDANTS to fall and ignite the dry highly combustible vegetation accumulated in the right-of-way located at Ku'ialua Street and Ho'okahua Place which spread rapidly to hundreds of acres of dry vegetation accumulated on adjacent land owned by BISHOP ESTATE and other landowners.

130. The HEI DEFENDANTS had a duty to use reasonable care to manage and/or clear the dry and highly combustible vegetation accumulated on their rights-of-way to prevent against ignition of a fire loss to adjacent properties, including the homes and units in Lahaina.

131. HEI DEFENDANTS failed to regularly manage and clear the dry and highly combustible vegetation in its rights-of-way in the Lahaina area and allowed this vegetation to accumulate directly beneath and adjacent to its energized power lines which created an unreasonable and highly dangerous risk of wildfire condition.

132. HEI Defendants' failure to reasonably manage and clear the dry and highly combustible vegetation accumulated on its rights-of-way in the Lahaina area was negligent and/or grossly negligent and/or a violation of HRS §132-8, and a substantial factor in causing the Lahaina Fire which displaced thousands of residents, including Plaintiffs and Class Plaintiffs, and caused them to suffer Displacement Damages.

133. On August 8, 2023, HEI DEFENDANTS knew that preemptively de-

energizing its power lines was necessary to prevent a catastrophic wildfire and to protect residences and buildings from destruction and  its residents from forcible displacement.

134.   On August 6, 7, & 8, 2023, the HEI DEFENDANTS failed to preemptively de-energize their electric power lines in the Lahaina area during Red Flag Warning conditions which was constituted negligence, wilful misconduct, gross negligence and recklessness, and was a substantial factor in causing the Plaintiffs and Class Plaintiffs' Displacement Damages.

135.  Upon information and belief, the HEI DEFENDANTS negligently failed to establish or implement any specific protocols to be used when the National Weather Service issues a Red Flag Warning, including, disregarding the PUC Tariff, continual monitoring of weather reports and conditions, surveilling lines as necessary for situational awareness, in the potential Red Flag Warning area, implementing sensitive protection settings to circuits so once a breaker opens, it remains open, localized shut offs in extreme conditions.

136.  The HEI DEFENDANTS egregious misconduct warrants the imposition of punitive damages in amounts to be determined at the time of trial.

137.   HEI DEFENDANTS' conduct, as aforesaid, was intentional and in complete disregard to the rights of the Plaintiffs and Class Plaintiffs entitling

Plaintiffs and Class Plaintiffs to warrant the imposition of punitive damages in an amount to be determined at the time of trial.

138.   HEI DEFENDANTS are jointly and severally liable for the Plaintiffs' damages and punitive damages.

139.   On August 27, 2023, the HEI DEFENDANTS acknowledged that their downed electrical equipment ignited the August 8, 2023, Lahaina morning fire.

140.   HEI DEFENDANTS owed the Plaintiffs and Class Plaintiffs the duty to exercise reasonable care in the provision of electrical power, including the duties to:

141.   To design, construct, inspect, repair, and maintain their power poles, power lines,transformers, reclosers, and other electrical equipment adequately; maintain, operate, and inspect their power lines, overhead electrical infrastructure, and equipment properly to ensure they would not cause a fire:

a. To de-energize their power lines during a Red Flag Warning to prevent fires, and/or;

b. To de-energize their power lines during a High Wind Watch to prevent fires, and/or;

c. To de-energize their power lines during high fire danger warnings, and/or;

d. To conduct adequate vegetation management, such as clearing vegetation, trees, and tree limbs that could come into contact with their power lines and

equipment, and/or;

e. To de-energize their power lines after Defendants had knowledge that some power lines had fallen or otherwise come into contact with vegetation, structures, and objects, and/or;

f. To de-energize their power lines after Defendants' overhead electrical infrastructure had ignited fires, and/or;

g. To implement reasonable policies and procedures to maintain and operate their equipment in such a manner as to avoid igniting or spreading fire, and/or;

h. To adjust their operations despite warnings about fire weather conditions that could result in downed power lines and cause rapid and dangerous fire growth and spread on and after August 8, 2023, and/or;

i. To immediately remove power poles which blocked evacuation routes during the Lahaina Fire.

142.  As set forth in the foregoing paragraphs, HEI DEFENDANTS breached each and all of these duties owed to Plaintiffs and Class Plaintiffs, including but not limited to, failing to properly maintain and keep its electrical poles and power lines in sound condition to encounter foreseeable high wind events; and in failing to de-energize the power under Red Flag Warning and High Wind Watch conditions.

143.  HEI DEFENDANTS knew or should have known that residents of

Lahaina, lincluding Plaintiffs and Class Plaintiffs, would foreseeably suffer injury or death as a result of HEI DEFENDANTS' failure to exercise reasonable and ordinary care.

144.  The Plaintiffs and Class Plaintiffs' Displacement Damages was the direct and proximate result of HEI DEFENDANTS' negligence, wilful misconduct, gross negligence and recklessness. The Displacement Damages alleged herein are permanent and will continue into the future.

145.  The HEI DEFENDANTS are jointly and severally liable for each other's negligence, conduct, and wrongdoing as alleged hereinabove.

146.  As a result of the foregoing, Plaintiffs and the Class Plaintiffs have suffered Displacement Damages in an amount to be determined at trial.

147.  The conduct of the HEI DEFENDANTS as alleged herein, was negligent, wilful misconduct, gross negligence, reckless, and/or abnormally dangerous conduct with gross neglect, willfully and wantonly, maliciously, and/or with intentional disregard for Plaintiffs' and Class Plaintiffs ' rights, so as to warrant the imposition of punitive damages in amounts to be determined at trial.

## COUNT IV - BISHOP ESTATE's LIABILITY FOR CAUSING THE LAHAINA FIRE

148.  Plaintiffs and Class Plaintiffs hereby incorporate by reference and realleges each and every paragraph above as though fully set forth herein.

149.  A 2018-2019 report from the Hawaii Wildfire Management Organization was particularly attuned to the fact that research shows vegetation is a "key ingredient in the recipe for recurring wildfire."  The report pointed out the seemingly obvious conclusion that "reducing wildfire hazard is a landscape-level issue" because fires do not respect property boundaries.  The report noted that over the past decade more than 1,000 wildfires burned more than 17,000 acres occur every year in Hawaii.  The report concluded  that much of the increased rate of wildfire in Hawaii, more than a 400% increase over the past  century, is because of human conduct and specifically related to "nonnative, fire-prone grasses and shrubs [that] now cover nearly one quarter of Hawaii's total land area and, together with a warming, drying climate and year-round fire season, greatly increase the incidence of larger fires."

150.  BISHOP ESTATE is a multibillion dollar trust which owns thousands of acres of extremely valuable land on each of the Hawaiian Islands, and has diversified its assets worldwide.  BISHOP ESTATE's negligence, wilful misconduct, gross negligence and recklessness was a primary cause of the Lahaina Fire, and it bears a special duty and responsibility to protect and compensate the residents of Lahaina, which was once the historic capitol of  Hawaii.  On August 8, 2023, BISHOP ESTATE knew that its Maui properties, including land immediately beneath the MECO power lines on Lahainaluna Road, as well as lands adjacent to the residences

and units in Lahaina were covered by an accumulation of dry highly combustible vegetation which was an extreme fire hazard to the lives and safety of the residents living in Lahaina and their property.   BISHOP ESTATE knew that the same fire hazards on its properties had caused the 2018 Ka'aula Valley Wildfire which burned over 2,100 acres, destroyed dozens of residence and structures and displaced approximately 60 residents, and had come perilously close to destroying Lahaina town.  Yet, on April 20, 2020, BISHOP ESTATE apparently failed the fire brush inspection off the Lahainaluna Road area in violation of the Maui County Fire Code 10.13.10.2.1, which required that a 30-foot area under the power lines and poles "must be cleared of flammable vegetation."

151.  Based on the 2018 Kaua'ula Valley Wildfire, and the Red Flag Warnings and High Wind Watches issued by the NWS on August 6, 7, and 8, 2023, BISHOP ESTATE knew that high gusty winds posed an imminent threat and danger of wildfire rapidly spreading over hundred of acres of dry and highly combustible vegetation and grasses growing and accumulating on their fallow agricultural lands in Lahaina to Plaintiffs and Class Plaintiffs and causing them to suffer Displacement Damages.

152.  BISHOP ESTATE knew that the accumulation of dry highly combustible vegetation on their property was an extreme fire hazard to the lives and safety of the Plaintiffs and Class Plaintiffs residing in Lahaina, as demonstrated by the Kaua'ula

Valley Wildfire and multiple Red Flag Warnings issued by the NWS on August 6, 7 and 8, 2023.

153.  BISHOP ESTATE owed a duty to the Plaintiffs and Class Plaintiffs to perform adequate vegetation management/elimination on their land to avoid contributing fuel to wildfires and to design, create and maintain adequate and effective firebreaks of areas adjacent to Lahaina's residences and units to prevent huge uncontrollable wildfires from spreading rapidly over hundreds of acres of highly combustible vegetation accumulating on their lands and to protect Plaintiffs and Class Plaintiffs from suffering Displacement Damages.

154.  In addition to, and coextensive with, their common law duties regarding the management of their property, BISHOP ESTATE was at all times relevant, required to comply with HRS 132-8, which requires all property owners to keep their premises "reasonably safe from loss of life or injury to persons or property by fire."

155.  BISHOP ESTATE's failure to prevent  fire from spreading to adjacent properties, including Lahaina's homes and businesses, by regularly clearing highly combustible vegetation on its property violated Maui County Code 10.13.10.2.1, and was a substantial factor in causing the Lahaina Fire, the displacement of 12,000 residents and causing them to suffer Displacement Damages.

156.  BISHOP ESTATE  negligent failure  to properly manage or clear the dry

and highly combustible vegetation accumulating on their lands was a substantial factor in causing the Lahaina Fire to spread rapidly and destroy Lahaina, including approximately 3,000 residences and units and displaced more than 12,000 residents, including Plaintiffs and Class Plaintiffs, was negligent, wilful misconduct, gross negligence, reckless and a violation of HRS §132-8, and  was a substantial factor in causing the Plaintiffs and Class Plaintiffs to suffer Displacement Damages.

157.  Despite actual knowledge and repeated Red Flag Warnings of the risk of the catastrophic wildfires, BISHOP ESTATE wilfully left their lands unmanaged, to become overgrown with highly flammable, nonnative vegetation and also further failed to implement adequate fire mitigation measures, including failing to install proper fire breaks or to irrigate their properties.

158.  On August 8, 2023, a downed power line on BISHOP ESTATE land ignited the dry combustible vegetation accumulated thereon, which spread rapidly in high winds to adjacent residences and units in Lahaina, killed 102 people, and displaced over 12,000 Lahaina residents.  BISHOP ESTATE's conscious disregard of the lessons learned from the 2018 Ka'aula Valley Wildfire, its egregious violations of the Maui County Code 10.13.10.2.1, ignoring the multiple Red Flag Warnings, and its wilful failure to eliminate the combustible vegetation accumulated on its properties, demonstrates wilful misconduct, gross negligence and recklessness for the

rights and safety of the residents and property of Lahaina.  Even after the Lahaina Fire, BISHOP ESTATE has twice failed County fire brush inspections, on September 26, 2023, and again on May 21, 2024.

159.  BISHOP ESTATE's wilful misconduct  constitutes negligence, gross negligence, recklessness, malice and/or oppression which was the direct and proximate cause of the August 8, 2023, Lahaina Fire and the Displacement Damages, including homelessness and permanent severe emotional distress, resulting therefrom.  BISHOP ESTATE's m i s conduct was knowing, intentional and egregious warranting an award of punitive damages in such amounts to be determined at the time of trial.

160.  BISHOP ESTATE owed the public and Plaintiffs and Class Plaintiffs the duty to exercise reasonable care in the maintenance of vegetation on their property, including the duties to:

a. Use reasonable care to maintain their property in such a way that would avoid causing injury to members of the public, and/or;

b. Prevent and/or remove conditions on its property that are unreasonably dangerous to neighbors and the public, and/or;

c. Take reasonable steps to abate dangers to the public which exist on their property and under their control, and/or;

73

d. Adequately manage grasslands and other flammable vegetation on their land to avoid the ignition or spread of wildfire on their land thereby endangering nearby properties.

161. As set forth in the foregoing paragraphs, BISHOP ESTATE breached each and all of these duties owed to Plaintiffs and Class Plaintiffs by, including but not limited to, failing to properly maintain and/or clear flammable vegetation on its land thereby endangering adjacent residences and units from the rapid spread of wildfire.

162. BISHOP ESTATE knew or should have known that the Plaintiffs and Class Plaintiffs would suffer Displacement Damages as a result of its failure to exercise reasonable and ordinary care.

163. As a direct and proximate result of BISHOP ESTATE's negligence, wilful misconduct, gross negligence and/or recklessness, the Lahaina Fire scorched about 3,000 acres of dry and highly combustible vegetation and grasses growing and accumulating on fallow agricultural lands, owned by, or adjoining lands owned by BISHOP ESTATE. The fires which burned on lands owned by BISHOP ESTATE spread rapidly to Lahaina and destroyed or rendered uninhabitable almost all of the residences, including those in which Plaintiffs and Class Plaintiffs resided.

164. Based on the 2018 Kaua'ula wildfire, BISHOP ESTATE knew that high gusty winds posed an imminent threat and danger of wildfire to adjoining landowners

and Lahaina residents caused by wildfire rapidly spreading over hundred of acres of dry and highly combustible vegetation and grasses growing and accumulating on their fallow agricultural lands in Lahaina, Maui.

165. BISHOP ESTATE  had a duty to prevent huge uncontrollable wildfires from spreading rapidly over hundreds of acres of highly combustible vegetation accumulating on their lands and to protect adjacent landowners and inhabitants, including landowners and inhabitants of Lahaina town, from being destroyed by wildfire.

166. In addition to, and coextensive with, their common law duties regarding the management of their property, BISHOP ESTATE was at all times relevant, required to comply with HRS.§132-8, which requires all property owners to keep their premises "reasonably safe from loss of life or injury to persons or property by fire."

167. BISHOP ESTATE's failure to prevent fire from spreading to adjacent properties, including Lahaina's homes and businesses, by regularly clearing highly combustible vegetation on its property violated Maui County Code 10.13.10.2.1, and was a substantial factor in causing the Lahaina Fire, the displacement of 12,000 residents and their Displacement Damages.

168. BISHOP ESTATE  negligently failure  to properly manage or clear the

dry and highly combustible vegetation accumulating on their lands was a substantial

factor in causing the Lahaina Fire to spread rapidly and destroy Lahaina, including

approximately 3,000 residences and units and displaced more than 12,000 residents,

including Plaintiffs and Class Plaintiffs, was negligent, wilful misconduct, gross

negligence, reckless and a violation of HRS §132-8, and  was a substantial factor in

causing the Plaintiffs and Class Plaintiffs to suffer Displacement Damages.

169.  As a result of the foregoing, Plaintiffs and the Class Plaintiffs have

suffered Displacement Damages in an amount to be proven at trial.

170.  The conduct of the BISHOP ESTATE as alleged herein, was negligent,

wilful misconduct,  gross negligence, reckless, and/or abnormally dangerous conduct

with gross neglect, willfully and wantonly, maliciously, and/or with intentional

disregard for Plaintiffs' and Class Plaintiffs ' rights, so as to warrant the imposition

of punitive damages in amounts to be determined at the time of trial.

## COUNT V - THE MAUI FIRE DEPARTMENT's
## LIABILITY FOR CAUSING THE LAHAINA FIRE

171.  Plaintiffs and Class Plaintiffs hereby reallege and incorporate by

reference, all of the allegations set forth above, as though fully set forth herein.

172.  MFD consists of a Fire Chief, and necessary staff.  Under the Fire Chief,

the Department performs fire fighting to save lives and property from fires, including

the mitigation and stabilization of hazardous fire conditions.

173.   On August 8, 2023, MFD was a department of MAUI, and MFD's personnel were employees of MEMA and/or MAUI.

174.  On August 6, 7, & 8, 2023, MFD received multiple notices that  Red Flag Warning and High Wind Watches were in effect, which meant the existence of imminent danger or threat of an emergency or disaster due to extreme and critical fire danger from August 6 through August 9, 2023, for the Lahaina area.

175.  On August 8, 2023, at approximately 6:35 a.m., the high gusty winds knocked down an energized MECO electric power line adjacent to Ku'ialua Street and Ho'okahua Place across from the Lahaina Intermediate School, which fell on highly combustible vegetation accumulated on the HEI DEFENDANTS and TELCOM DEFENDANTS right-of-way beneath or adjacent to their power poles and lines which ignited a wildfire that spread rapidly to hundreds of acres of land owned by BISHOP ESTATE.

176.  MFD immediately responded to the wildfire and deemed it to be "100% contained" at 8:30 a.m. and declared it to be "extinguished" at 2:17 p.m.   At  2:18 p.m. the entire fire team vacated the burn site without posting a fire watch during Red Flag Warning and High Wind Watch conditions.

177.  MFD knew that  Red Flag Warning and High Wind Watch conditions could rekindle the fire which would spread rapidly to hundreds of acres of dry and

highly combustible vegetation on BISHOP ESTATE lands and destroy adjacent residences and buildings in the Lahaina area.

178.  MFD knew that during the Red Flag Warning and High Wind Watch conditions the burn site posed an imminent danger or threat of an emergency or disaster to the residents and  homes in Lahaina town and that it was reasonable and necessary to post a fire watch to prevent and/or extinguish any flare-up to protect the people, homes, and businesses located in and around Lahaina town.

179.  At approximately 2:55 p.m. on August 8, 2023, MFD received reports that high gusty winds had rekindled the fire at the burn site which was  spreading rapidly to the hundreds of acres of highly combustible vegetation accumulated on land owned by BISHOP ESTATE.

180.  By the time MFD responded and arrived back at the site of the rekindled fire, at 3:04 p.m. MFD encountered smoke and bad visibility.  MFD crew members stated that they had never felt winds like that before.

181.  By then, the rekindled fire had already spread to the highly combustible vegetation accumulated on lands owned by BISHOP ESTATE, and MFD was unable to contain the wildfire which was spreading rapidly to adjacent residences and buildings in the Lahaina  area.  At approximately 3:17 p.m., the wildfire jumped the Bypass at Kelawea Mauku Makai Park and destroyed the residences and buildings in

Lahaina town.

182.  The Lahaina Fire continued to spread rapidly from house to house and eventually burned and devastated almost all of the residences and buildings in the Lahaina area.

183.  By August 9, 2023, most of Lahaina had been destroyed.

184.  On September 20, 2023, a Maui firefighter admitted that "when we left [the scene of the fire] we were confident it was out, but obviously we were wrong."

185.  MFD vacated the burn site during Red Flag Warning and High Wind Watch conditions without posting a fire watch.  Within 30 minutes, the high winds had rekindled the vegetation at the burn site which ignited dry highly combustible vegetation accumulated on hundreds of acres of BISHOP ESTATE property, which spread rapidly to destroy adjacent residences and units in Lahaina.  The Lahaina Fire killed 102 people, destroyed more than 3,000 residences and buildings and displaced more than 12,000 residents, including Plaintiffs and Class Plaintiffs, causing them to suffer Displacement Damages.

186.  If MFD had posted a capable fire watch at the burn site during Red Flag Warning and High Wind Watch conditions, the flare-up would have been preemptively extinguished, which would have prevented the Lahaina Fire from devastating Lahaina and killing 102 people, destroying 3,000 structures and

displacing more than 12,000 residents, including Plaintiffs and Class Plaintiffs, which caused them to suffer Displacement Damages.

187.  MFD's failure to post a fire watch at burn site during Red Flag Warning and High Wind Watch conditions was negligent and a substantial factor and a direct and proximate cause of the Lahaina Fire which devastated Lahaina, including killing 102 people, destroyed 3,000 structures and displaced more than 12,000 residents, including Plaintiffs and Class Plaintiffs, which caused them to suffer Displacement Damages.

188.  MFD's decision to vacate the burn scene without posting a fire watch during Red Flag Warning and High Wind Watch conditions was negligent, grossly negligent, and/or reckless, and a substantial factor in causing the Lahaina Fire and the displacement of more than 12,000 residents, including Plaintiffs and Class Plaintiffs, which caused them to suffer Displacement Damages.

189.  MFD is an agency or department of MAUI, and the fire fighters are employees of MAUI which is liable for indemnification under the doctrine of respondeat superior for the negligence, gross negligence, and/or recklessness of MFD employees which caused or contributed to the Lahaina Fire, thereby displacing Plaintiffs and Class Plaintiffs and causing them to suffer Displacement Damages.

190.  MFD is liable to Plaintiffs and Class Plaintiffs for Displacement Damages

for negligence, gross negligence, and/or recklessness, and under HRS Chapter 127A.

191.   As a result of the foregoing, Plaintiffs and the Class Plaintiffs have suffered Displacement Damages in an amount to be proven at trial.

192.   The conduct of the MFD as alleged herein, was negligent, wilful misconduct,  gross negligence, reckless, and/or abnormally dangerous conduct with gross neglect, willfully and wantonly, maliciously, and/or with intentional disregard for Plaintiffs' and Class Plaintiffs' rights, so as to warrant the imposition of punitive damages in amounts to be determined at the time of trial.

## COUNT VI - THE MAUI EMERGENCY MANAGEMENT AGENCY AND THE COUNTY OF MAUI's LIABILITY FOR THE LAHAINA FIRE

193.   Plaintiffs and Class Plaintiffs hereby reallege and incorporate by reference each and every paragraph above, as though the same were fully set forth herein.

194.   Pursuant to the Emergency Management Statutes, Hawaii Revised Statutes ("HRS") §127A-1 the State authorized the County of Maui to create MEMA for emergency management in the county of Maui, and conferred upon BISSEN "the emergency powers necessary to prepare for and respond to emergencies or disasters", as follows:

(a) Because of the existing and increasing possibility of the occurrence of disasters or emergencies of unprecedented size and destructiveness

81

resulting from natural or human-caused hazards, and in order to ensure that the preparations of this State will be adequate to deal with such disasters or emergencies; to ensure the administration of state and federal programs providing disaster relief to individuals; and generally to protect the public health, safety, and welfare, and to preserve the lives, property, and environment of the State, it is hereby found and declared to be necessary:

(1)  To provide for emergency management by the State, and to authorize the creation of local organizations for emergency management in the counties of the State;

(2)  To confer upon the governor and upon the mayors of the counties of the State the emergency powers necessary to prepare for and respond to emergencies or disasters;

195.   Pursuant to the HRS §127A-5 (c), MAUI is responsible for the establishment, naming, and operation of MEMA, under the mayor's direction.

196.  Pursuant to HRS §127A-5(b), MEMA performed emergency management functions within the territorial limits of the county of Maui, including administering and operating the various local, state, and federal emergency programs for the County of Maui, and planning, preparing, and coordinating emergency operations in meeting disaster situations such as the Lahaina Fire and coordinating post-disaster recovery operations.

197.  Pursuant to HRS §127A-5 (a), BISSEN had direct responsibility for emergency management within Maui County, including organization, administration and operation  of MEMA, including the emergency powers necessary to prevent a repeat of the 2018 Kaua'ula Valley Wildfire, and to prepare for and prevent the 2023

Lahaina Fire.

198.  Pursuant to HRS §127A-5(i), BISSEN and ANDAYA had a duty and direct responsibility to coordinate, develop, and implement a comprehensive emergency management plan for the county and submit annual reports to the administrator on the status and updates of the plan in order to prevent a repeat of the 2018 Kaua'ula wildfire, and to ensure the timely and effective response to the imminent threat of Red Flag Warning disasters and emergencies to the Lahaina area.

199.  Pursuant to HRS §127A-8, BISSEN and ANDAYA are "emergency workers" and deemed to be employees of the County of Maui, as follows:

> Status and rights of personnel.  (a)  All state and county officials, officers, and employees are considered "emergency workers" and shall perform functions as determined by their respective state or county department director during emergencies or disasters.
>
>  (b) If any state or county official, officer, or employee is engaged in carrying out this chapter in lieu of the official, officer, or employee's regular office or employment, the amount of the official, officer, or employee's compensation shall not be adversely affected, and the official, officer, or employee's rights in or under the laws relating to vacation and leave, the retirement system, civil service or the like, shall not be adversely affected.
>
>   (c)  All persons, including volunteers whose services have been accepted by authorized persons, while engaged in the performance of duty pursuant to this chapter, including duty performed during exercises and training, shall be deemed state employees if the performance of duty is for the State, or county employees if the performance of duty is for the county, and shall have the powers, duties, rights, and privileges of such in the performance of their duties, except as may be prescribed by or under the authority of the governor or the mayor, pursuant to this chapter.

200.  Pursuant to HRS §127(A)(9), BISSEN and ANDAYA  are civilly liable "for the death of or injury to persons, or property damage, as a result of any act or omission in the course of the employment or duties", as follows:

(5) Except in cases of wilful misconduct, gross negligence, or recklessness, persons engaged in emergency management functions pursuant to this chapter, including volunteers whose services are accepted by any authorized person, shall be civilly liable for the death of or injury to persons, or property damage, as a result of any act or omission in the course of the employment or duties under this chapter.

201.  The risks to Lahaina from a catastrophic wildfire was well-documented, and had  been actually demonstrated by the 2018 Kaua'ula Valley Wildfire.

202.  BISSEN and ANDAYA knew that the 2018 Kaua'ula Valley Wildfire had been caused by MEMA's failure to make any emergency preparations prior to Hurricane Lane, including without limitation, preemptively de-energize MECO's power lines to the Lahaina area, lack of warning siren, lack of water for fire fighters, lack of an evacuation plan, and lack of a brush abatement program.

203.  Pursuant to HRS §127A-5(i), BISSEN and ANDAYA had a duty and direct responsibility to coordinate, develop, and implement a comprehensive emergency management plan for the county and submit annual reports to the administrator on the status and updates of the plan in order to prevent a repeat of the 2018 Kaua'ula wildfire, and to ensure the timely and effective response to the imminent threat of Red Flag Warning disasters and emergencies to the Lahaina area.

204.  BISSEN and ANDAYA failed to coordinate, develop, and implement a comprehensive emergency management plan to submit to the administrator on the status and updates of the plan in order to prevent a repeat of the 2018 Kaua'ula wildfire, and to ensure the timely and effective response to the imminent threat of Red Flag Warning disasters and emergencies to the Lahaina area.

205.  BISSEN and ANDAYA's failure to plan, prepare, and coordinate emergency operations to prevent and protect Lahaina against a repeat of the 2018 Kaua'ula wildfire and complete failure to make any emergency preparations prior to the August 8, 2023 Lahaina Fire constituted wilful misconduct, gross negligence, and/or recklessness pursuant to HRS 127A-9(a)(5).

206.  MEMA and MAUI negligently failed to establish or implement any specific protocols to be used when the National Weather Service issues a Red Flag Warning, including, designating evacuation routes; pre-positioning of evacuation warning assets and emergency response equipment or assets to clear evacuations routes, continual monitoring of weather reports and conditions, surveilling lines as necessary for situational awareness in the potential Red Flag Warning area, directing MECO to implement sensitive protection settings to circuits so once a breaker opens, it remains open, localized shut offs in extreme conditions.

207.  On August 6, 7, and 8, 2023, prior to the ignition of the Lahaina Fire,

BISSEN and ANDAYA knew that the National Weather Service had issued multiple

Red Flag Warnings and High Wind Watches covering the Lahaina area.

208.  BISSEN and  ANDAYA knew that the Red Flag Warnings and High

Wind Watches indicated a state of emergency, and the existence of an imminent

danger or threat of an catastrophic wildfire disaster by "critical fire weather

conditions" and "extreme fire behavior" for the Lahaina area.

209.  The Fire Weather Planning Forecast issued on August 7, 2023,

specifically warned that, "[v]ery dry fuels (KDBI around 600) combined with strong

and gusty easterly winds with low humidities below 45% will produce critical fire

weather conditions through tonight."

210.  The High Wind Watches issued on August 6, 7, & 8, 2023, expressly

warned that "[d]amaging winds may blow down trees and power lines."

211.  On August 7, 2023, prior to the Lahaina Fire, BISSEN and ANDAYA

knew that the high winds had toppled MECO power lines and caused wildfires in

Kula and Olinda before the Lahaina Fire was ignited.  BISSEN self-reported that he

"had been in communication with the county's Emergency Operating Center during

the fires, including a virtual meeting the morning of August 8 because the Kula fire

had started late the night before. (Kula Fire)."  On August 8, 2023, at 6:22 a.m., the

high winds also downed a MECO power line which caused a brush fire in Olinda

(Olinda Fire).

212.  On August 6, 7, & 8, 2023, BISSEN and ANDAYA  knew that  the high winds which the NWS had predicted could topple power poles and knock down power lines and ignite hundreds of acres of highly combustible vegetation accumulated on BISHOP ESTATE's land adjacent to Lahaina residences and buildings.

213.  On August 6, 7, & 8, 2023, BISSEN and ANDAYA also knew that if the MECO overhead electric power lines fell and ignited the dry combustible vegetation on BISHOP ESTATE's land, the high winds would cause a raging wildfire to rapidly spread  to adjacent residences and buildings in Lahaina, and displace Plaintiffs and Class Plaintiffs and cause them to suffer Displacement Damages.

214.  On August 6, 7, & 8, 2023, BISSEN, as the head of MEMA, had multiple emergency powers necessary to prevent a repeat of the 2018 Kaua'ula wildfire, and to respond to 2023 Red Flag Warnings and prepare for the imminent danger or threat of a disastrous wildfire to Lahaina, by declaring a state of emergency and to direct the MECO to preemptively shut off  electric power connections to the Lahaina area, pursuant to HRS §127A-1(a)(2) and HRS §127A-14(b) and HRS §127A-13(b)(3).

215.  Based  on  the multiple Red Flag Warnings and High Wind Watches issued by the NWS on August 6, 7, 8, 2023, and the Kula Fire and the Olinda Fire,

BISSEN and ANDAYA had a duty pursuant to HRS §127A-13(b)(3) to exercise their power to prevent the Lahaina Fire by directing MECO to preemptively de-energize its power lines to the Lahaina area prior to the ignition of the 2023 Lahaina Fire.

216.  The decision of BISSEN and ANDAYA to permit MECO to energize its electrical power lines during Red Flag Warnings, and their failure to plan, prepare, and coordinate emergency operations to prevent and protect Lahaina against a repeat of the 2018 Kaua'ula Valley Wildfire, was outrageous and egregious and demonstrates a deliberate indifference to their responsibilities and duties in violation of HRS Chapter 127A, including HRS §127A-5 (a) and (b), HRS §127A-14(b) and HRS §127A-13(b)(3), entitling the Plaintiffs and Class Plaintiffs to recover Displacement Damages from BISSEN, ANDAYA and the County of Maui, in amounts to be determined at trial.

217.  Although the NWS had issued Red Flag Warnings and High Wind Warnings on August 6, 7, & 8, 2023, BISSEN and ANDAYA failed to fully activate the EOC until August 8, 2023 at 4:30 p.m., after Lahaina had already been substantially devastated, and after its 12,000 residents, including Plaintiffs and Class Plaintiffs, had already been displaced.

218.  Pursuant to HRS §127A-5(g), BISSEN and ANDAYA had the duty to establish a procedure for the appointment and designation of stand-by officers during

an emergency period, who shall serve in the event of the unavailability of the officers for whom they are standing-by.

219.  On August 29, 2023, BISSEN admitted that, "I'm not sure who was in charge" of MEMA on August 8, 2023.

220.  On August 29, 2023, BISSEN stated that he "thinks Herman Andaya, was in charge" even though he knew, or should have known, that ANDAYA was attending a Federal Emergency Management Agency conference on Oahu.

221.  On August 29, 2023, BISSEN stated that "he didn't know the 'chain of command' if Andaya was off island at the time."

222.  BISSEN's entire want of care, conscious indifference to consequences and failure to perform his duty to establish a procedure for the appointment and designation of stand-by officers, including, but not limited to, his ignorance of who was in charge of MEMA, if anyone, in the absence of ANDAYA, violated HRS §127A-5(g) and was egregious and outrageous and constituted gross negligence and/or recklessness pursuant to HRS §127A-9(a)(5).

223.  BISSEN and ANDAYA's entire want of care, conscious indifference to consequences and failure to coordinate, develop, and implement a comprehensive emergency management plan to submit to the administrator on the status and updates of the plan to prevent a repeat of the 2018 Kaua'ula wildfire, and to ensure the timely

89

and effective response to the imminent threat of Red Flag Warning disasters and emergencies to the Lahaina area violated HRS §127A-5(I), and was egregious and outrageous and constituted gross negligence, and/or recklessness pursuant to HRS §127A-9(a)(5).

224. BISSEN and ANDAYA failed to timely perform emergency management functions and to coordinate all emergency management plans within the county of Maui for training purposes and to monitor the response and timeliness of MEMA, MFD, and the Maui Police Department before and in response to Red Flag Warning conditions on August 6, 7, & 8, 2023.

225. The failure of BISSEN and ANDAYA to perform emergency management functions constituted wilful misconduct, gross negligence and/or recklessness, and violated HRS §127A-1(a)(2) and HRS §127A-5(b).

226. MEMA and MAUI negligently failed to establish or implement any specific protocols to be used when the National Weather Service issues a Red Flag Warning, including, designating evacuation routes; pre-positioning of evacuation warning assets and emergency response equipment or assets to clear evacuations routes, continual monitoring of weather reports and conditions, surveilling lines as necessary for situational awareness in the potential Red Flag Warning area, directing MECO to implement sensitive protection settings to circuits so once a breaker opens,

it remains open, localized shut offs in extreme conditions.

227.   The failure of the MEMA and MAUI to establish or implement any specific protocols to be used when the National Weather Service issues a Red Flag Warning was a substantial factor in causing the Lahaina Fire, and displacement of the Lahaina residents including Plaintiffs and Class Plaintiffs.

228.  On August 27, 2023, Jon Heggie, a public information officer of the Joint Information Center, Maui Communications Team admitted that, "the only continuous communication the county had with Hawaiian Electric's Maui subsidiary was to check on the status and clearance of downed transmission lines and poles blocking roads and highways."

229.  On, or about, August 27, 2023, the Honolulu Star-Advertiser's observed that, "On the day of the tragedy that killed at least 115 people, first responders were overwhelmed with reports of fallen power lines and snapped electric poles amid wind gusts of up to 60 mph, yet Maui County did not ask Hawaiian Electric to turn off the power during red flag conditions."

230.  Jon Heggie replied to the Honolulu Star-Advertiser in an interview and stated, "The county cannot ask independent, privately-owned companies, outside of the fire code and public resource codes, to alter their business practices, minus a violation of either of those (codes),"

91

231.  On August 27, 2023, BISSEN and/or ANDAYA, knew that Jon Heggie's public statement was false and misleading because, ( a ) HRS 127A-13(b)(3) expressly grants them the power to "shut off electrical power connections" to Lahaina, (b)  on August 8, 2023, BISSEN had issued an Emergency Proclamation, directing the Director of the Maui Emergency Management Agency to "shut off . . . the electric connections" for the Lahaina area which was not based on a "fire code and public resource codes" violation, and (c) on August 24, 2023, BISSEN had filed a lawsuit alleging that the HEI Defendants were guilty of "gross negligence" for failure to "de-energize its power lines" during Red Flag Warning and High Wind Watch conditions without alleging any "fire code or public resource code" violation.

232.  The failure of BISSEN and ANDAYA to correct Heggie's false and misleading statement constitutes clear and convincing evidence of an attempted "cover up" and warrants the imposition of punitive damages in an amount to be determined at the time of trial.

233.  BISSEN's and ANDAYA's entire want of care, conscious indifference to consequences, and failure to prevent a repeat of the 2018 Kaua'ula wildfire, and to prepare for timely and effective responses to an imminent threat of Red Flag Warning disasters and emergencies to Lahaina town in violation of HRS §127A-5(a) was egregious and outrageous, and constituted gross negligence, and/or recklessness,

pursuant to HRS 127A 9(a)(5).

234.  BISSEN's and ANDAYA's violations of HRS §127A-5(a), HRS §127A-5(b), HRS §127A-5(c), HRS §127A-5(e), HRS §127A-5(g), HRS §127A-14(b) and/or HRS §127A-13(b)(3), were substantial factors in causing the Lahaina Fire and in causing Plaintiffs and Class Plaintiffs to suffer Displacement Damages

235.  BISSEN's and ANDAYA's  entire want of care, conscious indifference to consequences, and violations of HRS §127A-5(a), HRS §127A-5(b), HRS §127A-5(c), HRS §127A-5(e), HRS §127A-5(g), HRS §127A-14(b) and/or HRS §127A-13(b)(3) was egregious and outrageous and constituted gross negligence and/or recklessness under HRS §127A-9(a)(5) and in complete disregard to the rights of Plaintiffs and Class Plaintiffs to warrant the imposition of punitive damages in an amount to be determined at the time of trial.

236.  Pursuant to HRS §127A-9(a)(5), on August 6, 7, & 8, 2023, BISSEN and ANDAYA were "persons engaged in emergency management functions" and are "civilly liable for . . . injury to persons . . . as a result of any act or omission in the course of the employment or duties under this chapter."

237.  Pursuant to HRS §127A-8 (a) and (c), BISSEN and ANDAYA are "emergency workers" and are deemed to be "county employees" who "shall have the powers, duties, rights, and privileges of such in the performance of their duties."

238.   HRS §127A-9(a)(5) provides that, in cases of gross negligence, or recklessness, BISSEN and ANDAYA, who were  persons engaged in emergency management functions, "shall be civilly liable for . . . injury to persons . . . as a result of any act or omission in the course of the employment or duties under this chapter."

239.   At all times relevant to this Class Action Complaint, BISSEN and ANDAYA were engaged in the performance of their duties for the County of Maui, pursuant to HRS §127A-8(c), and were deemed county employees with the powers, duties, rights, and privileges of such in the performance of their duties, including indemnification.

240.   MAUI is civilly liable for the Displacement Damages suffered by Plaintiffs and Class Plaintiffs as a result of BISSEN's, ANDAYA's, MEMA's, and MFD's wilful misconduct, gross  negligence, and/or recklessness in the course of their employment or duties   pursuant to HRS §127A-8(a) and (c), HRS §127A-9(a)(5), and indemnification under the doctrine of respondeat superior.

241.   As a result of the foregoing, Plaintiffs and the Class Plaintiffs have suffered Displacement Damages in an amount to be determined at trial.

242.   The conduct of the BISSEN, ANDAYA, MEMA, and MFD  as alleged herein, was negligent, wilful misconduct, gross negligence, reckless, and/or abnormally dangerous conduct with gross neglect, willfully and wantonly,

maliciously, and/or engaged in with intentional disregard for Plaintiffs' and Class Plaintiffs' rights, so as to warrant the imposition of punitive damages in amounts to be determined at trial.

## COUNT VII - DEFENDANTS HAWTEL, HAWTELCOM, CINCINNATI BELL, CHARTER, and SPECTRUM's SPECTRUM's LIABILITY FOR CAUSING THE LAHAINA FIRE

243.   Plaintiffs and Class Plaintiffs hereby re-allege and incorporate by reference each and every paragraph above, as though the same were fully set forth herein.

244.  All of the TELCOM DEFENDANTS are multibillion dollar corporations which are liable for negligently overloading and failing to properly install, maintain or reinforce the electric poles which were downed by the high winds.  They are also liable for failing to clear the vegetation in their right-of-ways which was ignited by MECO's energized power lines which caused fire to spread rapidly over BISHOP ESTATE properties adjacent to Lahaina residences and buildings, causing 102 deaths, destruction of 3,000 residents and units and displacement of over 12,000 residents causing them to suffer Displacement Damages.

245.   Upon information and belief, TELCOM DEFENDANTS executed agreements for their joint use of MECO's wood power poles on Maui.  Pursuant to these agreements for pole attachments, the HAWTELCOM, HAWTEL,

CINCINNATI BELL, CHARTER, and SPECTRUM owned and operated tele-communications equipment attached to the MECO pole infrastructure on Maui. Upon information and belief, under the agreements, the HAWTELCOM, HAWTEL, CINCINNATI BELL, CHARTER, and SPECTRUM shared the duty to keep vegetation properly cleared to prevent ignition by energized power lines. Upon information and belief, these agreements were approved by the Hawaii Public Utilities Commission.

246.    Upon information and belief, HAWTEL, HAWTELCOM, and CINCINNATI BELL were responsible for performing proactive and corrective vegetation management in the areas surrounding their shared equipment. The pole licensing agreements contained a "Vegetation Trimming" clause, which stated that "[j]oint trimming of vegetation will be on a 50/50 basis and a contractor will trim whenever possible." These vegetation maintenance clauses created a joint duty, requiring HAWTEL, HAWTELCOM, and CINCINNATI BELL to maintain vegetation adjacent to the licensed poles and beneath the telecommunication lines. HAWTEL, HAWTELCOM, and CINCINNATI BELL breached this duty by failing to trim vegetation around the poles and beneath the telecommunication lines, which provided the wildfire fuel caused by the fallen power lines.

247.    Upon information and belief, CHARTER's and SPECTRUM's January

96

2020 pole licensing agreement with the HEI DEFENDANTS also contemplated that the "Companies will be responsible for and perform proactive and corrective Vegetation Management around electric cables and the Power Space on Utility Poles and the Lighting Space on Streetlight Poles." This included "[p]roactive and corrective Vegetation Management on and around the Poles" and "Corrective Vegetation Management in the Communications Space and around Licensee's Communications Facilities when the Companies become aware of a condition that threatens the physical integrity of the Poles and/or . . . has the potential to impact public safety or reliable delivery of electric service."  The pole licensing agreement was approved by the Hawaii Public Utilities Commission.

248.   HAWTEL, HAWTELCOM, CINCINNATI BELL, CHARTER, and SPECTRUM were  also responsible for properly designing, constructing, installing, using, inspecting, repairing, and adequately maintaining their telecommunications equipment attached to the MECO poles.  This duty included a duty to design, maintain, and inspect their communications equipment so as to not overload the poles or otherwise cause the shared poles to break, snap, and/or fail during high wind events.

249.   HAWTEL, HAWTELCOM, CINCINNATI BELL, CHARTER, and SPECTRUM cables overloaded the poles and were a substantial factor in causing the

power lines to fall and ignite the dry highly combustible brush accumulated in the infrastructure right-of-ways.  On August 8, 2023, HAWTEL, HAWTELCOM, CINCINNATI BELL, CHARTER, and SPECTRUM knew that they had negligently overloaded pole 7A near Ku'ialua Street and Ho'okahua Place, and/or  negligently failed to construct, install, use, inspect, repair, and adequately maintain and/or reinforce said pole to withstand the weight of their respective cables causing it to break which caused the energized  power lines to fall and ignite the overgrown vegetation below or adjacent to the right-of-way on BISHOP ESTATE's property.

250.   The failure of HAWTEL, HAWTELCOM, CINCINNATI BELL, CHARTER, and SPECTRUM to construct, install, use, inspect, repair, and adequately maintain and/or reinforce said pole to withstand the weight of their cables attached to said pole during high winds events violated the joint pole licensing agreement approved by the Hawaii Public Utilities Commission.

251.   HAWTEL, HAWTELCOM, CINCINNATI BELL, CHARTER, and SPECTRUM negligently failed to design and attach their equipment to MECO's pole in a safe manner, pursuant to their pole licensing agreements with the HEI DEFENDANTS.

252. HAWTEL, HAWTELCOM, CINCINNATI BELL, CHARTER, and SPECTRUM knowingly and negligently failed to construct, install, use, inspect,

repair, and adequately maintain and/or reinforce said pole to withstand the weight of their respective cables and/or to clear and maintain vegetation beneath and surrounding the lines which was a substantial factor in causing the August 8, 2023, Lahaina Fire, and the Plaintiff's and Class Plaintiffs' Displacement Damages.

253.   As a result of the foregoing, Plaintiffs and the Class Plaintiffs have suffered Displacement Damages in an amount to be proven at trial.

254.   The conduct of the HAWTEL, HAWTELCOM, CINCINNATI BELL, CHARTER, and SPECTRUM as alleged herein was negligent, wilful misconduct, gross negligence, reckless, and/or abnormally dangerous conduct with gross neglect, willfully and wantonly, maliciously, and/or with intentional disregard for Plaintiffs' and Class Plaintiffs ' rights, so as to warrant the imposition of punitive damages in amounts to be determined at the time of trial.

## COUNT VIII - PRIVATE NUISANCE

255.   Plaintiffs and Class Plaintiffs hereby re-allege and incorporate by reference each and every allegation contained above as though the same were set forth herein in full.

256.   Plaintiffs and Class Plaintiffs  had possessory interests in property the Lahaina Fire damaged, destroyed, and/or harmed, and that possessory interest includes the right to quiet use and enjoyment.

257.   The negligence, recklessness, and/or abnormally dangerous actions and inactions of the Defendants, as set forth above, caused and contributed to the Lahaina Fire that damaged created a nuisance that has unlawfully annoyed and disturbed Plaintiffs' and Class Plaintiffs' free use, possession, and enjoyment of their real and/or personal property and caused them to suffer Displacement Damages.

258.   As a result of the foregoing, Plaintiffs and the Class Plaintiffs have suffered Displacement Damages in an amount to be proven at trial.

259.   Defendants acted with gross neglect, willfully and wantonly, maliciously, and/or with intentional disregard for Plaintiffs' and Class Plaintiffs' rights, so as to warrant the imposition of punitive damages in amounts to be determined at the time of trial.

## COUNT IX  - PUBLIC NUISANCE

260.   Plaintiffs and Class Plaintiffs hereby re-allege and incorporate by reference each and every allegation contained above as though the same were set forth herein in full.

261.  The wrongful acts and/or omissions of Defendants, as set forth above, caused and contributed to the Lahaina Fire that caused Displacement Damages to Plaintiffs and the Class Plaintiffs.

262.  The wrongful acts and/or omissions of Defendants, as set forth above,

created an unreasonable risk of harm that a fire would ignite during Red Flag Warning conditions and cause more than 12,000 Plaintiffs and Class Plaintiffs to suffer Displacement Damages.

263. Defendants' behavior was negligent, wilful misconduct, gross negligence, reckless, and/or abnormally dangerous.

264. Defendants caused Plaintiffs and Class Plaintiffs to suffer Displacement Damages distinct from the general public.

265. Whatever social utility the operations of the Defendants may provide is outweighed by the Displacement Damages Defendants' operations have imposed on Plaintiffs and the Class Plaintiffs.

266. As a result of the foregoing, Plaintiffs and the Class Plaintiffs have suffered Displacement Damages in an amount to be proven at trial.

267. Defendants substantially and unreasonably interfered with Plaintiffs' and the Class Plaintiffs' use and enjoyment of their property. This interference constitutes a nuisance for which Defendants are liable to Plaintiffs and the Class Plaintiffs, including Displacement Damages, and warrants the imposition of punitive damages in amounts to be determined at the time of trial.

## COUNT X- TRESPASS CAUSING DISPLACEMENT

268. Plaintiffs and Class Plaintiffs hereby re-allege and incorporate by

reference each and every allegation contained above as though the same were set forth herein in full.

269. At all times relevant herein, Plaintiffs and Class Plaintiffs owned and/or had possessory interests and/or occupied residences destroyed or otherwise rendered uninhabitable by the Lahaina Fire.

270. Defendants had a duty to use reasonable care not to enter, intrude on, or invade Plaintiffs' and Class Plaintiffs' residences or to unlawfully interfere with Plaintiffs' and Class Plaintiffs' possession of their residences.

271. Through the wrongful actions and inactions set forth above, Defendants negligently caused the Lahaina Fire to ignite and/or spread out of control, causing the Lahaina Fire to wrongfully and forcibly displace the Plaintiffs and Class Plaintiffs from their residences.

272. Through the wrongful actions and inactions set forth above, Defendants negligently caused the Lahaina Fire to ignite and/or spread out of control, causing the Lahaina Fire to unlawfully displace Plaintiffs and Class Plaintiffs from their residences. The spread of a negligently caused fire to wrongfully displace a resident constitutes a trespass. The spread of a negligently caused fire to unlawfully interfere with Plaintiffs' and Class Plaintiffs' possession of their residential properties constitutes a trespass to chattel.

273. Plaintiffs and Class Plaintiffs did not grant permission to Defendants to cause the Lahaina Fire to enter their residential properties and/or damage or destroy their residential properties.

274. As a direct, proximate, and substantial cause of the trespasses, Plaintiffs and Class Plaintiffs have suffered and will continue to suffer Displacement Damages in amounts to be proved at the time of trial.

275. As a result of the foregoing, Plaintiffs and the Class Plaintiffs have suffered Displacement Damages in amounts to be proven at trial.

276. Defendants' conduct was willful and wanton, and with a conscious disregard for the disastrous consequences that Defendants knew could occur as a result of their dangerous conduct. Accordingly, Defendants acted with malice towards Plaintiffs and Class Plaintiffs which is an appropriate predicate fact which warrants the imposition of punitive damages in amounts to be determined at the time of trial.

## COUNT XI – STRICT LIABILITY

277. Plaintiffs and Class Plaintiffs hereby re-allege and incorporate by reference each and every allegation contained above as though the same were set forth herein in full.

278. At the time the Lahaina Fire, HEI DEFENDANTS were knowingly

engaged an inherently dangerous activities.

279.  At the time of the Lahaina Fire, HEI DEFENDANTS' above-described activities carried peculiar risks to human safety, and/or involved special danger. These activities caused the Lahaina Fire to ignite and spread.

280.  HEI DEFENDANTS' conducted their inherently dangerous activity in the manner as alleged herein, by ignoring prior wildfire history in the Lahaina area, causing the Lahaina Fire which destroyed Lahaina, including without limitation, killing 102 people, destroying more than 3,000 residences, and displacing approximately 12,000 Lahaina residents and causing them to suffer Displacement Damages.

281.  In carrying on the aforesaid inherently dangerous activity, Defendants are strictly liable to the Plaintiffs and Class Plaintiffs for Displacement Damages and warrants the imposition of punitive damages in amounts to be determined at the time of trial.

282.  All Defendants other than the HEI DEFENDANTS were aware that HEI DEFENDANTS were engaging in and/or participated in inherently dangerous activities in a faulty manner as alleged in paragraph 280 above and are thereby equally strictly liable for all damages suffered by Plaintiffs and Class Plaintiffs and for punitive damages.

283.   As a result of the foregoing, Plaintiffs and the Class Plaintiffs have suffered Displacement Damages in amounts to be determined at the time of trial.

284.   Defendants' conduct was willful and wanton, and with a conscious disregard for the disastrous consequences that Defendants knew could occur as a result of their inherently dangerous activity.  Accordingly, Defendants acted with malice towards Plaintiffs and Class Plaintiffs which is an appropriate predicate fact which warrants the imposition of punitive damages in amounts to be determined at the time of trial.

### COUNT XII - INVERSE CONDEMNATION
### UNDER AMENDMENTS V AND XIV
### OF THE  UNITED STATES CONSTITUTION

285.   Plaintiffs and Class Plaintiffs hereby re-allege and incorporate by reference each and every allegation  contained above as though the same were set forth herein in full.

286.   On August 8, 2023, Plaintiffs and Class Plaintiffs owned, leased, or otherwise held interests in real and personal property in Lahaina.

287. MAUI has the power of condemnation under the Fifth Amendment of the U.S. Constitution and Article I, Section 20 of the Hawaii Constitution.  Similarly, HEI DEFENDANTS, while private entities, functioned as a state-regulated public utility responsible for maintaining critical electrical infrastructure, making them

subject to inverse condemnation liability for their role in causing the Lahiana Fire.

288.   MAUI's liability is not limited to its failure to act but extends to its affirmative actions that created and exacerbated the danger of wildfire and the resulting destruction of the Plaintiffs' and Class Plaintiffs' property:

### A.     County of Maui's Affirmative Decision to Authorize MECO to Energize Powerlines Despite Foreseeable Extreme Wildfire Risk

289.   On  August 8, 2023, MAUI affirmatively permitted MECO to energize its power lines over BISHOP ESTATE's lands which were covered with accumulated dry combustible vegetation adjacent to Lahaina residences and buildings, despite multiple Red Flag Warnings and High Wind Watches issued by the National Weather Service on August 6-8, 2023, leading to the ignition of the August 8, 2023, Lahaina Fire.

290.   On August 8, 2023, MAUI, through its statutory emergency response authority, despite multiple Red Flag Warnings from the National Weather Service, affirmatively allowed MECO to continue to energize its power lines in and around Lahaina despite the obvious foreseeable risks, because of negligence, wilful misconduct, gross negligence, and/or recklessness, and/or personal ties between the MAUI's officials who exercised such emergency authority and HECO's personnel and management.

291.  MAUI exercised statutory emergency powers under HRS Chapter 127A,

which grants counties broad authority to regulate public utilities, coordinate disaster response, and take necessary actions to protect public safety during emergencies. Under these emergency powers, MAUI's officials affirmatively authorized MECO to energize its power lines during Red Flag Warning and High Wind Watch conditions, knowing that they would fall and ignite extreme rapidly spreading wildfires adjacent to Lahaina residences and buildings. Moreover, MAUI "took up the mantle of responsibility" and occupied the space of emergency response and fire prevention by designating its agency the "Maui Emergency Management Agency", inducing MECO to rely on its appropriate exercise of emergency authority.

292. Despite multiple Red Flag Warnings from the National Weather Service and widely known historical precedents of utility-caused wildfires under similar weather conditions, MAUI, affirmatively allowed MECO to continue to energize its electrical infrastructure in Lahaina.

293. Although MECO's power lines had failed and ignited fires in Kula and Olinda earlier in the day, and also in 2018, MAUI affirmatively permitted MECO to continue to energize its power lines and to cause additional ignition sources on BISHOP ESTATE lands adjacent to Lahaina when it was fully aware that:

a. The region was already suffering from high winds, arid conditions, and low humidity, creating extreme wildfire hazards.

b. Multiple downed power lines had already ignited vegetation in Kula and Olida, demonstrating the imminent danger of affirmatively allowing MECO to continue to energize its power lines.

294. Although MAUI was aware that other jurisdictions in high-fire-risk areas had implemented formal Public Safety Power Shutoff (PSPS) protocols, it affirmatively chose not to implement a PSPS system to protect Lahaina residents, including Plaintiffs and Class Plaintiffs.

295. MAUI's affirmative decision to allow MECO to energize its power lines was not based on public safety concerns, but was instead influenced by conflicting family motivations. MAUI had:

a. Significant financial entanglements with HEI DEFENDANTS, including infrastructure projects, tax revenues, and long-term public-private partnerships dependent on HEI DEFENDANTS's operational stability.

b. Personal and political ties between County officials and HEI DEFENDANTS' executive leadership, creating conflicts of interest that compromised independent decision-making in the face of a clear and present wildfire risk.

c. Concerns over economic disruption and potential liability if widespread power outages affected local businesses, tourism, and government operations, further motivating County officials to prioritize power supply continuity over wildfire

prevention.

296.   Despite "taking up the mantle" of "emergency management" with statutory authority and agency designation, thereby causing HEI DEFENDANTS to rely on it, MAUI affirmatively permitted MECO to energize its power lines—a foreseeable and direct cause of the Lahaina Fire—and MAUI knowingly and deliberately placed thousands of lives and properties at risk.

297. MAUI's affirmative decision to permit MECO to energize its powerlines over Defendant BISHOP ESTATE lands covered with accumulated highly combustible vegetation adjacent to Lahaina residences and buildings, was made in reckless disregard of public safety, directly contributed to the unconstitutional taking and destruction of the Plaintiffs' and Class Plaintiffs' property and causing Plaintiffs' and Class Plaintiff's Displacement Damages, rendering the MAUI liable under inverse condemnation principles.

**B.    Maui's Affirmative Consent to Allow the Accumulation of Highly Combustible Vegetation on BISHOP ESTATE Lands Adjacent to Lahaina Residences and Buildings**

298.   MAUI affirmatively permitted BISHOP ESTATE to maintain the accumulation of non-native, highly flammable grasses and vegetation on lands and rights-of-way adjacent to Lahaina residence and other structures.

299.  MAUI  affirmatively permitted BISHOP ESTATE to ignore fire brush

inspections and violate vegetation clearance statutes/ordinances and construction of proper firebreaks  and controlled burns despite years of documented warnings and actual notice of extreme wildfire risk.

### C. Promotion of High-Risk Land Development Without Fire Mitigation Measures

300.    MAUI approved the construction of residences and high-density developments adjacent to known wildfire-prone areas while affirmatively permitting BISHOP ESTATE to ignore proper fire prevention infrastructure, such as:

a. Managing and clearing highly combustible vegetation to accumulate on its property.

b. Lack of defensible space buffers between urban areas and wildfire-prone lands.

c. Inadequate road access and evacuation routes.

d. Insufficient water infrastructure to sustain fire suppression efforts.

### D.    Diversion and Depletion of Water Resources for Fire Suppression

301.  MAUI affirmatively implemented and enforced water diversion policies that significantly reduced access to water for fire suppression, particularly in Lahaina, where streams and reservoirs historically used for firefighting were restricted for other uses.

302.   On the day of the Lahaina Fire, firefighters were unable to access adequate water pressure to combat the rapidly spreading flames, directly increasing Plaintiff's and Class Plaintiff's Displacement Damages.

### E.    Emergency Preparedness Failures That Increased Fire Destruction

303.  Despite possessing real-time fire risk data, MAUI affirmatively chose not to activate its emergency sirens, or otherwise broadcast any warning, leaving residents unaware of the fire's rapid approach.

304.  MAUI affirmatively imposed road closures and evacuation routes which resulted in gridlock and blocked exits, trapping residents and contributing to loss of life and Plaintiff's and Class Plaintiff's Displacement Damages.

### F.    Failure to Implement Post-Fire Hazard Mitigation, Further Damaging Plaintiffs' and Class Plaintiffs' Property

305.   After the Lahaina Fire, MAUI affirmatively imposed or conducted unnecessary and untimely actions which caused secondary hazards and damages, including:

a. Inappropriate and unnecessary rules and procedures delaying emergency housing and cost-of-living and other financial assistance, resulting in the exacerbation of Displacement Damages.

b. Toxic debris exposure from improperly handled post-fire cleanup.

111

c. Preventing residents immediate access to their residences and properties

causing and contributing to additional Displacement Damages.

### G. MAUI's Liability Also Extends to the Taking of Plaintiffs' and Class Plaintiffs' Property for Public Use Without Just Compensation, in the Following Ways

306.   MAUI's affirmative conduct in managing land, diverting water,

approving unsafe development, and failing to implement known fire prevention

measures directly and foreseeably caused the Plaintiffs' and Class Plaintiffs'

Displacement Damages.

307. The fire, smoke, toxic debris, and hazardous post-fire conditions resulting

from the Lahaina Fire have rendered many properties permanently uninhabitable, or

uninhabitable for the foreseeable future, and for many years into the future, resulting

in the Plaintiffs' and Class Plaintiffs' Displacement Damages.

308.  MAUI has also expressed its desire to take possession and ownership of

the certain waterfront properties makai of Front Street for its own use in the future

and is likely to do so via its use of permitting and regulatory restrictions that enrich

itself.

309.  By creating the conditions that made the fire inevitable and exacerbating

the destruction, MAUI effectively appropriated private property for public use

without just compensation, in violation of the Fifth Amendment's Takings Clause and

Hawaii's inverse condemnation doctrine.

310.  The Lahaina Fire caused substantial and ongoing damage to Plaintiffs and Class Plaintiffs, including:

a. Total loss of real and personal property, including homes, businesses, and land.

b. Loss of use and quiet enjoyment of properties.

c. Forced displacement costs, including temporary housing, increased living expenses, and loss of community stability.

d. Economic damages, including lost wages, lost business income, and loss of earning capacity.

e. Health and environmental damages, including exposure to toxic debris, soil contamination, and hazardous air conditions.

f. Legal expenses and attorneys' fees necessary to seek just compensation.

311.  MAUI is liable for attorneys' fees, expert witness fees, and litigation costs under 42 U.S.C. § 4654(c) because Plaintiffs and Class Plaintiffs have been forced to litigate to obtain just compensation for the taking of their property.

a. Plaintiffs are entitled to recover their full legal expenses as:

1) MAUI, acting with governmental authority, affirmatively created the conditions that led to property destruction, rather than merely failing to prevent it.

113

2) Plaintiffs' and Class Plaintiffs' displacement and destruction of property necessitated litigation to secure compensation under inverse condemnation principles.

3) MAUI's failure to provide proper emergency relocation assistance also entitles Plaintiffs and Class Plaintiffs to an award of attorney fees under the Uniform Relocation and Assistance Act's relocation assistance provisions.

312.   MAUI's conduct constitutes a taking of private property for public use without just compensation, in violation of the Fifth and Fourteenth Amendments to the U.S. Constitution and Article I, Section 20 of the Hawaii Constitution.

313.  Plaintiffs and Class Plaintiffs seek full and fair compensation, including but not limited to damages for property loss, economic harm, health risks, and attorneys' fees, in amounts to be proven at trial.

## COUNT XIII – PUNITIVE DAMAGES

314.   Plaintiffs and Class Plaintiffs hereby re-allege and incorporate by reference each and every allegation contained above as though the same were set forth herein in full. Plaintiff restates and incorporates the allegations above as if fully stated herein.

315.  At all times material hereto, all Defendants knew that high winds could cause electrical poles and wires to fall and ignite dry highly combustible vegetation accumulated in MECO right-of-ways and on BISHOP ESTATE properties which

114

would spread rapidly and result in a catastrophic Fire which could destroy Lahaina town and cause economic and non-economic damages, including, without limitation, displacement, homelessness, severe and permanent emotional distress, and lifelong suffering.

316.  Defendants engaged in conduct that constitutes wilful misconduct, gross negligence, recklessness, malice, and/or oppression.  Despite actual knowledge and repeated warning of the risk of the catastrophic August 8, 2023, Lahaina Fire, Defendants engaged in conduct that constitutes wilful misconduct, gross negligence, recklessness, malice, and/or oppression, by failing to implement or perform preemptive measures, including, without limitation, hardening the electrical grid, de-energizing the power lines, eliminating the combustible vegetation, accumulating on their right-of ways and properties, and posting fire watches during hurricane force winds.  The Defendants' conscious and deliberate disregard for the rights and safety of the residents of Lahaina was the direct and proximate cause of the August 8, 2023, Lahaina Fire, which displaced approximately 12,000 residents including Plaintiffs and Class Plaintiffs thereby causing widespread and permanent economic and non-economic damages, including, without limitation, homelessness and severe emotional distress.  The aforesaid conduct was grossly negligent, reckless, wilful, knowing, intentional, and/or egregious entitling Plaintiffs and Class Plaintiffs to an

award of punitive damages in amounts to be determined at trial.

## PRAYER FOR RELIEF

Plaintiffs and Class Plaintiffs seek judgment against all Defendants, jointly and severally as appropriate, for damages in amounts according to proof at trial and to other and further relief, as follows:

1. Confirmation that this lawsuit is properly maintainable as a class action;.

2. Appointment of Plaintiffs as Class Representatives for Class Plaintiffs;

3. Appointment of counsel for Plaintiffs as Class Counsel for Class Plaintiffs;

4. Displacement Damages against all Defendants, jointly and severally as appropriate, named in the Counts above according to proof at trial;

5. Punitive damages against all Defendants as appropriate as alleged in the Counts above;

6. Prejudgment and post judgment interest against all Defendants, jointly and severally as appropriate; and

7. Total damages as alleged above in excess of $5,000,000.

8. Attorney fees and costs against all Defendants, jointly and severally as appropriate; and

9. Such other and further relief the Court may deem just and proper.

DATED: Honolulu,  Hawaii, August 6, 2025.

_____/s/ Samuel P. King, Jr._____

SAMUEL P. KING, JR.

ROY Y. YEMPUKU

RUSSEL D. MYRICK (pro hac vice pending)

Attorneys for Plaintiffs, Individually, and in Their
  Representative Capacities on Behalf of Class
  Plaintiffs